**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MONTGOMERY COUNTY, MARYLAND; | ) | Case No. 8:26-cv-3025 |
| MONTGOMERY COUNTY, MARYLAND | ) | |
| POLICE DEPARTMENT; MONTGOMERY | ) | |
| COUNTY, MARYLAND SHERIFF'S OFFICE; | ) | |
| and MAXWELL C. UY, in his official capacity as | ) | |
| Sheriff of Montgomery County, Maryland, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

Plaintiff the United States of America submits the following Complaint against Defendants Montgomery County, Maryland (Montgomery County), Montgomery County Police Department (MCPD), Montgomery County Sheriff's Office (MCSO), and Maxwell C. Uy in his official capacity as Sheriff of Montgomery County, Maryland.

### INTRODUCTION

1.      The right of the people to keep and bear arms is among those fundamental rights necessary to our system of ordered liberty.  *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 778 (2010). The Second Amendment protects the right of law-abiding citizens to bear arms in public for lawful purposes such as self-defense.  *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 9-10 (2022); *Wolford v. Lopez*, 146 S. Ct. 2032, 2040 (2026); *Kipke v. Moore*, 165 F.4th 194, 207 (4th Cir. 2026) (holding that the Second Amendment protects "the carrying of guns in public").

2.      Under the standard common-law rule regarding access to private property held open to the public, everyone, including those lawfully carrying firearms, may enter unless expressly prohibited

from doing so. *Wolford*, 146 S. Ct. at 2040-41. A law that bans citizens from carrying firearms into "places that people routinely visit in the course of their daily routines . . . hobbles what the Second Amendment protects: the right of Americans to carry arms for self-defense as they go about their daily lives," and is therefore unconstitutional. *Id*. at 2041.

3.      On July 27, 2026, Montgomery County enacted Expedited Bill No. 23-26 (Bill 23-26). Numerous provisions of Bill 23-26 violate the Second Amendment. Montgomery County law enforcement officers are charged with enforcing these unconstitutional restrictions and are doing so. Such law enforcement misconduct is unlawful and, therefore, subject to injunction pursuant to 34 U.S.C. § 12601(a) (Section 12601). The United States brings this action to vindicate the constitutional rights of the law-abiding citizens of Montgomery County.

## PARTIES

4.      Plaintiff is the United States of America.

5.      Montgomery County is a governmental authority as that term is used in 34 U.S.C. § 12601.

6.      MCPD is a law enforcement agency within Montgomery County.

7.      MCSO is a law enforcement agency established by the Constitution of the State of Maryland and Maryland statutes.

8.      Defendant Uy is the Sheriff of Montgomery County, Maryland.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345.

10.     The Court has authority to grant the remedies Plaintiff seeks pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 34 U.S.C. § 12601. And the United States is authorized to initiate this action against the Defendants under Section 12601.

11.     The declaratory and injunctive relief that the United States seeks is authorized by 34 U.S.C.

§ 12601(b) and 28 U.S.C. §§ 2201 and 2202.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred therein.

## GENERAL ALLEGATIONS

**I.      Expedited Bill No. 23-26.**

13.     As relevant to this Complaint, Bill 23-26 states:

A "place of public assembly" is:

(1)   a publicly or privately owned:

    (A)  park;

    (B)  place of worship;

    (C)  school;

    (D)  library;

    (E)  recreational facility;

    (F)  multipurpose exhibition facility, such as a fairgrounds or conference center;

(2)   government building open to the public for the business of government or community use;

(3)   polling place;

(4)   courthouse; or

(5)   legislative assembly.

A "place of public assembly" includes all property associated with the place, such as a parking lot or grounds of a building.

\*   \*   \*

(a)   In or within 100 yards of a place of public assembly, a person must not:

(1)   sell, transfer, possess, or transport a ghost gun, undetectable gun, handgun,

3

rifle, or shotgun, or ammunition or major component for these firearms; or

(2)    sell, transfer, possess, or transport a firearm created through a 3D printing process.

(b)    This section does not:

(1)    prohibit the teaching of firearms safety or other educational or sporting use in the areas described in subsection (a);

(2)    apply to a law enforcement officer, or a security guard licensed to carry the firearm;

(3)    apply to the possession of a firearm or ammunition, other than a ghost gun or an undetectable gun, in the person's own home;

(4)    apply to the possession of one firearm, and ammunition for the firearm, at a business by either the owner who has a permit to carry the firearm, or one authorized employee of the business who has a permit to carry the firearm;

(5)    apply to separate ammunition or an unloaded firearm:

(A)    transported in an enclosed case or in a locked firearms rack on a motor vehicle, unless the firearm is a ghost gun or an undetectable gun; or

(B)    being surrendered in connection with a gun turn-in or similar program approved by a law enforcement agency; or

(6)    apply to a firearm that is carried or transported in a motor vehicle if the firearm is:

(A)    locked in a container; or

(B)    a handgun worn, carried, or transported in compliance with any limitations imposed under Section 5-307 of the Public Safety Article of the Maryland Code, as amended, by a person to whom a permit to wear, carry, or transport the handgun has been issued under the Public Safety Article of the Maryland Code, as amended.

14.    Subject to an extremely limited exception, the prohibitions of Bill 23-26 apply even against individuals who have a valid Maryland permit to carry a firearm.

15.    The prohibitions of Bill 23-26 apply even if a person who desires to carry a firearm on property obtains the express consent of the owner of the property to do so.

4

**II.     Bill 23-26 Is Presumptively Unconstitutional.**

16.     In *Bruen*, the Court set forth the following test for evaluating Second Amendment claims:

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

597 U.S. at 24.

17.     In *Wolford*, the Court clarified step one of the *Bruen* test:

> [The analysis required in a Second Amendment case] involves two steps.  First, a court must determine whether the law before it clashes with the plain text of the Amendment's language.  This inquiry entails three subsidiary questions.  First, does the law apply to the people—which is to say, to all members of the political community?  Second, does it concern any form of Arms, i.e., any weapon customarily used for offensive or defensive purposes?  Third, does the law place any restrictions on either the keeping (i.e., possession) or the bearing (i.e., carrying) of arms?

> If a challenged law falls within the plain text of the Second Amendment, *it is presumptively unconstitutional*—which means that it may violate the preexisting right that the Amendment codified.  But because that right was not in every way coterminous with the Amendment's literal language, further analysis may be needed.  Specifically, the relevant government—federal, state, or local may be able to show that its challenged law did not infringe the historical understanding of the codified right.

146 S. Ct. at 2043-44 (cleaned up; citations and quotation marks omitted; emphasis added).

18.     Thus, step one of the *Bruen* test requires the court to ask three questions:

A.  Does the law apply to the people?

B.  Does it concern any form of arms?

C.  Does the law place any restrictions on either the possession or carrying of arms?

19.     In this case, step one of the *Bruen* test is easily met.  No one can reasonably dispute that: (1) the individuals who are subject to the burdens of Bill 23-26 are among the "people;" (2) Bill 23-26 applies to arms; and (3) Bill 23-26 restricts the possession or carrying of arms.

5

20.    This is a "sensitive places" case.  In *Kipke*, the court stated that "[w]hen analyzing the sensitive places doctrine and determining where it fits within the *Bruen* framework . . . we hold that this doctrine goes to the 'proposed course of conduct,' namely, the carrying of guns in public, which the Second Amendment protects." 165 F.4th at 207.

21.    At *Bruen* step one, the text of the Second Amendment applies to the proposed conduct (i.e. carrying firearms in public).  Bill 23-26's restrictions on where arms may be possessed and carried thus limit rights protected by the Second Amendment.  Therefore, under *Wolford*, Bill 23-26 is presumptively unconstitutional.

**III.    Specific Location-by-Location Analysis under *Bruen*.**

    **A.    *Bruen* Requires Analogues That Are "Relevantly Similar" to Bill 23-26.**

22.    The burden under *Bruen* step one is on the party attacking the law (here, the United States with respect to law enforcement misconduct in the implementation of the law) and the "history and tradition" burden under step two is on the government defending the law (here, the Defendants).  *Hanson v. D.C.*, 120 F.4th 223, 232 (D.C. Cir. 2024), *abrogated on other grounds* by *Wolford v. Lopez*, 146 S. Ct. 2032 (2026).  A defendant's burden under step two is an affirmative defense to any presumption that arises at step one, and a plaintiff "need not anticipate and negate affirmative defenses" in its complaint.  *Cunningham v. Cornell Univ.*, 604 U.S. 693, 702 (2025) (citing *Perry v. Merit Systems Protection Bd.*, 582 U.S. 420, 435 n. 9 (2017)).  Thus, the United States has completely met its burden to plead a plausible Second Amendment violation and the burden shifts to Defendants in *Bruen* step two.  It is not necessary to anticipate and counter Defendants' step-two defenses.  Nevertheless, Plaintiff includes this section to demonstrate that Defendants will not prevail at step two.

23.    At *Bruen* step two, the Court's job is to determine whether "a firearm regulation is

consistent with this Nation's historical tradition." *Kipke*, 165 F.4th at 206 (quoting *Bruen*, 597 U.S. at 17). "A variety of sources, including scholarship, may aid this inquiry." *Wolford*, 146 S. Ct. at 2044. The best evidence is historical analogues. *Id*. Analogues that were widely adopted and accepted are more persuasive. *Id*. A court must consider whether the analogues are "relevantly similar" to the modern law. *Id*. Regarding this inquiry, the "how" and "why" questions are important. *Id*. Did the proposed analogue impose a similar restriction and was it similarly justified? *Id*. An analogue need not be a "dead ringer" or "historical twin." *Id*. This is especially true when the modern law addresses a situation that could not have arisen when the Second or Fourteenth Amendment was adopted. *Id*.

24. As set forth in the following subsections, under *Bruen's* step-two analysis, Bill 23-26 is unconstitutional with respect to its prohibition on the possession of firearms at (when not actively being used as polling places) parks, places of worship, libraries, recreational facilities, and multipurpose exhibition facilities. In addition, there is no founding era law analogous to Bill 23-26's 100-yard buffer zone.

### B.      Parks.

25. The relevant historical record confirms that in the founding era, governments were not broadly restricting firearms on public lands, urban green spaces, and other locations that could serve as legitimate historical analogues to Montgomery County's prohibition in parks. *Kipke v. Moore*, 165 F.4th 194, 243 (4th Cir. 2026) (Agee, J., dissenting) (cleaned up; citation and quotation marks omitted). Plaintiff acknowledges that the *Kipke* majority held otherwise, but *Kipke* was wrongly decided in this respect, and Plaintiff brings this action seeking to have that part of *Kipke's* holding overturned.

7

### C.    Places of Worship.

26.    Bill 23-26 precludes houses of worship from consenting to the entry of individuals lawfully carrying firearms.    Montgomery County will not be able to rebut the presumption of unconstitutionality because it will not be able to show that Bill 23-26 does not infringe upon the historical understanding of the right codified in the Second Amendment.    Indeed, just the opposite is true.    The nation has no "tradition of banning firearms in places of worship." *Wolford v. Lopez*, 116 F.4th 959, 996 (9th Cir. 2024), *rev'd on other grounds*, 146 S. Ct. 2032 (2026).[1]

### D.    Libraries.

27.    Libraries obviously existed at the time of the founding, and by 1850, the Census reported 1,217 public libraries in the United States.    *See* Dep't of Interior, 1850 Census: Compendium of Seventh Census, tbl CLXVII (1854) available at https://bit.ly/4w5zUxH.    Yet none of the states categorically banned firearms at libraries.    Thus, Bill 23-26's ban is not consistent with the nation's historical tradition.

### E.    Recreational Facilities.

28.    Despite the undeniable presence of places used for recreational purposes at the founding, there is no evidence of any founding-era laws prohibiting firearms in those places.    *Wolford v. Lopez*, 125 F.4th 1230, 1243 (9th Cir. 2025) (Vandyke, J., dissenting from denial of rehearing en banc).

---

[1] In *Maryland Shall Issue, Inc. v. Montgomery Cnty., Maryland*, 680 F. Supp. 3d 567 (D. Md. 2023), a division of this Court considered a prior version of the County's ordinance.    That case was ultimately remanded to the Maryland state courts and decided on state law grounds.    While the case was in this Court, the Court ruled on plaintiffs' motion for TRO and preliminary injunction.    The Court ruled the plaintiffs were not likely to prevail on the merits of their constitutional challenge to this provision.    *Id*. at 585.    That case was decided in a preliminary posture and was ultimately remanded to the state court.    The prior decision is not binding on this Court and was wrongly decided.    The same is true with respect to *Maryland Shall Issue's* holdings regarding the other sensitive places listed in the County's ordinance at the time.

### F.    Multipurpose Exhibition Facilities.

29.    There are no founding-era regulations analogous to a prohibition on carrying firearms at public gatherings of this kind. *See Antonyuk*, 639 F. Supp. 3d at 335.

### IV.    Bill 23-26 Sweeps Unconstitutionally Broadly.

30.    Bill 23-26 is breathtaking in scope. For all practical purposes, it prevents law-abiding citizens from carrying firearms as they go about their daily lives. The law does not merely forbid the possession of firearms at certain locations. It forbids carrying firearms at those locations *and* within 100 yards of those locations. The total area of Montgomery County where Bill 23-26 prohibits possession of firearms shall be referred to in this Complaint as the "Exclusion Zone." The Exclusion Zone is enormous. It encompasses literally thousands of locations. A small sample will suffice to demonstrate this. Montgomery County GIS Open Data shows that Montgomery County is home to:[2]

605 houses of worship, https://bit.ly/3OLbfvG,

693 public parks, https://bit.ly/3qjHLfb (not including four federal parks and any privately owned "parks"),

42 public recreation centers, https://bit.ly/3WB1VhL,

10 colleges and universities, https://bit.ly/3Csn5Yr,

45 post Offices, https://bit.ly/4h8YAhZ,

38 fire stations, https://bit.ly/4gfCxVy,

15 public swimming pools, https://bit.ly/4awPtW2,

13 Metro stations, https://bit.ly/4aySiG0, and

---

[2] Much of this data is set forth in the complaint in *Barreto v. Montgomery County, Maryland*, Case No. 8:26-cv-2912 (*Barreto*).

11 MARC commuter train locations, https://bit.ly/3Cdo3b7.

31.    This list is merely illustrative.  It does not include many of the places in the Exclusion Zone such "exhibition facilities," fairgrounds and conference centers.  Nor does it include areas within 100 yards of government buildings, polling places, courthouses, or the legislative assembly.

32.    Not surprisingly, this comprehensive ban on firearms prevents citizens from possessing firearms as a practical matter throughout most of the public (and many private) spaces in Montgomery County as they go about their daily lives.  The plaintiffs in *Barreto* have developed an interactive webpage consisting of a map of some of the areas that qualify as a "place of assembly" as that term is defined by Bill 23-26 (Fetterman Map).  The interactive map may be accessed at https://public.johnlettman.com/montgomery/.  Every location colored on the map represents a place encompassed by the definition of "a place of public assembly."  Specific details of each parcel, including its address and classification according to County records, can be shown

by dragging a cursor across individual areas in this online map.  A non-interactive copy of the

Fetterman Map is shown below:



33.    The Fetterman Map shows that there are at least 10,000 parcels comprising over 7,900

acres (over 26 percent of the County), that fall within the Exclusion Zone.  The area calculations

*exclude* the 100-yard buffer zones.  Thus, the area affected by the law is considerably greater than

26 percent of the entire County.

34.    Municipalities such as Gaithersburg contain areas within the Exclusion Zone with hundred-

yard buffers that will repeatedly and unpredictably include countless ordinary places of commerce,

private and public property open to the public and privately owned parking lots open to the public.

As a practical matter the enormous scope of the Exclusion Zone makes it almost impossible for a

citizen to walk through town to shop, to dine, or to do any other common activity of daily life

11

without likely entering the Exclusion Zone multiple times in a single trip and thereby becoming a criminal without ever intending to have done so (or even knowing that he has done so).

35.     Consider a person who owns a firearm and lives within 100 yards of a park.  Subsection 57-11(b)(3) says the law does not apply so long as the firearm stays "in the person's own home." But the person becomes a criminal if he steps into his own backyard.  Consider a church that has an adjacent parsonage.  The pastor is a criminal while walking to his place of employment. Moreover, the pastor is a criminal even in his own home if he has a spare magazine because the exception applies only to firearms and ammunition.  The exception does not apply to "components."

36.     In *Wolford v. Lopez*, 146 S. Ct. 2032 (June 25, 2026), the Supreme Court addressed a similar Hawaiian exclusion zone that effectively prevented citizens from carrying firearms while going about their daily lives.  The Court presented a detailed hypothetical following the daily life of a young Hawaiian who wanted to carry a firearm about on her daily errands.  The Court followed her through a gas station, drug and grocery stores, a restaurant, a place of employment and concluded that, ". . . by the end of an ordinary day, our hypothetical young woman could be a criminal at least six times over."  *Id*. at 2047-2049.  The Court held: "This regime hobbles what the Second Amendment protects: the right of Americans to carry arms for self-defense as they go about their daily lives.  We hold that the law is unconstitutional."  *Id*. at 2041.

37.     Montgomery's law suffers the same defect as Hawaii's law in *Wolford*—it prevents a hypothetical law-abiding young woman with a valid CCW permit from attending to daily life while carrying a firearm.  If she goes to church or if her various destinations are within a city block (a typical city block is about 100-110 yards) of a park, church, or the many other areas of the Exclusion Zone, she would be a criminal.  Even worse, every time she walks by a library (or its

parking lot), she is again a criminal.  When she steps out of her car and walks down a sidewalk that is about a block away from the neighborhood swimming pool, she is a criminal.

38.    Bill 23-26 actually is much more restrictive than the offending law in *Wolford*.  In Hawaii, a citizen could hope to get a property owner's permission to carry.  Not so in Montgomery County. The law makes no exception for situations in which a person obtains a property owner's express permission to carry on their property.  The carriers are still criminals.  The owners of churches, recreational facilities, etc. are not allowed to grant their visitors permission to carry a firearm.  Bill 23-26 is flagrantly contrary to the Supreme Court's holding in *Wolford*.

## V.    Bill 23-26's Prohibition on the Possession of "Components" and "Ammunition" Is Unlawful.

39.    With some very limited exceptions, Bill 23-26 prohibits the sale, transfer, possession or transportation of handguns, rifles, *ammunition, or "major components*" in or within 100 yards of places of public assembly.  "[F]or the right to bear arms to have meaning, the Amendment's text must carry an implicit, corollary right to bear the components or accessories necessary for the ordinary functioning of a firearm." *Duncan v. Bonta*, 133 F.4th 852, 866 (9th Cir. 2025).  And in *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014), the court held that the right to possess firearms implies a corresponding right to ammunition.  Thus, Bill 23-26's prohibition on the possession of components and ammunition is presumptively unconstitutional under *Bruen* step one.

40.    At *Bruen* step two, Montgomery County has the burden of proving a historical tradition of prohibiting the possession of components and ammunition.  They cannot do so.  There are no historical analogues from the founding era which likewise prohibit the possession of ammunition or firearm components.  Thus, the prohibition on possession of ammunition and components is unconstitutional.

13

41.    The exception for ammunition "transported in an enclosed case or in a locked firearms rack on a motor vehicle" does not save the law.  The District of Columbia required a trigger lock on handguns kept in the home.  The Court found that burden on the right of *immediate* self-defense to be intolerable under the Constitution.  *See D.C. v. Heller*, 554 U.S. 570, 635-636 (2008).

42.    Here, Bill 23-26 not only regulates handguns and rifles, but ammunition and "major components" of firearms within 100 yards of statutorily defined places of public assembly.  At no point does the statute define or even attempt to clarify the meaning of "major components."  Does this term mean a barrel?  A trigger?  A pistol grip?  Does the term only encompass portions of a firearm as large as the upper receiver, or does it encompass parts as small as a detent pin holding a safety selector switch in place?  Is a part as innocuous as an optic one of these major components?  Scopes, sights, and other things might fall within the definition.  Reasonable persons will invariably disagree on the line between illegal "major component" and legal "minor component."

## VI.    Other Portions of Bill 23-26 Fail to Specify a Standard of Conduct.

43.    Other provisions of Bill 23-26 are also indecipherable.  What is a "park"?  A large backyard fits within some definitions.  What is a "place of worship"?  The terms could include any place where people are worshiping, such as home Bible studies and prayer meetings.  What is a "recreational facility"?  Does it also include any place where people regularly have fun, such as a comedy club?

## VII.    Montgomery County's Law Enforcement Officers Enforce the Unlawful Prohibitions.

44.    MCPD is a law enforcement agency within Montgomery County.  MCPD is responsible for the enforcement of Montgomery County laws.  *See* Montgomery County Code (MCC) § 35-8.

45.    MCSO is a law enforcement agency established by the Constitution of the State of Maryland and Maryland statutes.  *See* Md. Code Pub. Safety § 1-101(c)(1)(ii)(7); Md. Code Crim.

Pro. § 2-101(c)(10)-(11).  MCSO is authorized to enforce laws of Montgomery County.  *See* MCC § 35-23; *Soper v. Montgomery Cnty*., 449 A.2d 1158, 1161 (Md. 1982) ("[O]rdinarily sheriffs retain the powers they possessed at common law including conserving public peace, preserving public order, preventing and detecting crime, enforcing criminal law . . . [and] those powers are concurrent with the powers now ordinarily exercised by police officers.").  While MCPD is the primary law enforcement agency within Montgomery County, *see id.* at 1164-65, MCSO retains its traditional powers to enforce criminal laws and make arrests.

46.    Defendant Uy is the Sheriff of Montgomery County, Maryland.  He is an elected Constitutional officer of the State of Maryland.  *See* Md. Const. art. IV, § 44.  In his capacity as the Sheriff of Montgomery Count, Defendant Uy is responsible for appointing deputy sheriffs who, in turn, have law enforcement powers within Montgomery County.  *See* Md. Code. Courts & Jud. Proc. § 2-329(d); Md. Code Pub. Safety § 1-101(c)(1)(ii)(7); Md. Code Crim. Pro. § 2-101(c)(10)-(11).

47.    Law enforcement officers at the agencies identified above shall be referred to as the "Montgomery County LEOs."  The unconstitutional provisions of Bill 23-26 identified above shall be referred to as the "Unlawful Prohibitions."

48.    Pursuant to the statutes identified above, the Montgomery County LEOs enforce the Unlawful Prohibitions.  Indeed, these law enforcement officers have an affirmative duty to use their best efforts to enforce the Unlawful Prohibitions.  In the case of a newly enacted law such as this one, it "would be unreasonable to assume that [Montgomery County] adopted [the law] without intending that it be enforced."  *Mobil Oil Corp. v. Att'y Gen. of Com. of Va*., 940 F.2d 73, 76 (4th Cir. 1991) (internal citations and quotation marks omitted).

49.     When the Montgomery County LEOs enforce the Unlawful Prohibitions, they are engaging

15

in a pattern or practice of conduct by law enforcement officers.  On information and belief, the law enforcement officers are fulfilling (and will continue to fulfill unless enjoined) their statutory duty to enforce the Unlawful Prohibitions and are engaged in a pattern or practice of law enforcement misconduct that deprives individuals of their federal civil rights protected under the Second Amendment to the United States Constitution.

**VIII.   Defendants Have Violated Section 12601**

50.     As pertinent to this action, 34 U.S.C. § 12601(a) states:

> It shall be unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers . . . that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

51.     Montgomery County is a governmental authority, as that term is used in Section 12601(a).

52.     When the Montgomery County LEOs enforce the Unlawful Prohibitions, they are acting as agents of and on behalf of Montgomery County.  The pattern or practice of conduct by law enforcement officers described above deprives persons of rights, privileges, or immunities secured or protected by the Constitution.  Therefore, Defendants are in violation of 34 U.S.C. § 12601(a).

53.     34 U.S.C. § 12601(b) ("Section 12601(b)") states:

> Whenever the Attorney General has reasonable cause to believe that a violation of paragraph (1)[3] has occurred, the Attorney General, for or in the name of the United States, may in a civil action obtain appropriate equitable and declaratory relief to eliminate the pattern or practice.

54.     The United States brings this action pursuant to the authority set forth in Section 12601(b) to remedy Defendants' violation of Section 12601(a).

---

[3] [*sic*] This should state "paragraph (a)."

**FIRST CLAIM FOR RELIEF**

55.    Plaintiff incorporates and realleges all of the allegations set forth in the previous paragraphs.

56.    Defendants have engaged in, and, on information and belief, will continue to engage in, a pattern or practice of conduct by law enforcement officers that deprives persons of rights secured and protected by the Constitution in violation of 34 U.S.C. § 12601(a).

57.    Unless this Court enjoins Defendants and also grants the declaratory relief the United States is seeking, Defendants will continue to engage in the pattern or practice of conduct described above, which pattern or practice of conduct deprives law-abiding individuals of their Second Amendment rights.

**PRAYER FOR RELIEF**

WHEREFORE, the United States hereby prays that the Court grant the following relief:

A.    Entry of a declaratory judgment pursuant to 28 U.S.C. § 2201(a), declaring that:

(1)    Montgomery County is a "governmental authority" as that term is used in Section 12601(a);

(2)    The Montgomery County LEOs are "law enforcement officers" as that term is used in Section 12601(a);

(3)    When the Montgomery County LEOs enforce the Unlawful Prohibitions, they are acting as agents of (or otherwise acting on behalf of) Montgomery County;

(4)    When the Montgomery County LEOs enforce the Unlawful Prohibitions they are engaging in a pattern or practice of conduct by law enforcement officers; and

(5)    When the Montgomery County LEOs enforce the Unlawful Prohibitions, the effect of that conduct is to deprive the populous of Montgomery County and its visitors of their rights guaranteed by the Second Amendment.

B.    Entry of preliminary and permanent injunctive relief pursuant to Fed. R. Civ. P. 65 enjoining Defendants from enforcing the Unlawful Prohibitions.

17

C.      Such other and additional relief as the interests of justice may require.


DATED:  August 3, 2026

Respectfully submitted:

HARMEET K.  DHILLON
Assistant Attorney General
Civil Rights Division

JESUS OSETE
Principal Deputy Assistant Attorney General

R.  JONAS GEISSLER
Deputy Assistant Attorney General

BARRY K. ARRINGTON
Acting Chief
Second Amendment Section

*/s/ Gregory Dolin*
GREGORY DOLIN
Senior Counsel

WILLIAM J.  HANRAHAN
PATRICK TODD
KEITH GAINES
Trial Attorneys
Second Amendment Section
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C.  20530
Telephone:(202) 304-8447
E-Mail:  gregory.dolin@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA