## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MONTGOMERY COUNTY, MARYLAND; | )    Case No. 8:26-cv-03025 |
| MONTGOMERY COUNTY, MARYLAND | ) |
| POLICE DEPARTMENT; MONTGOMERY | ) |
| COUNTY, MARYLAND SHERIFF'S OFFICE; | ) |
| and MAXWELL C. UY, in his official capacity as | ) |
| Sheriff of Montgomery County, Maryland, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Plaintiff the United States of America submits the following Memorandum in Support of its Motion for Preliminary Injunction against Defendants Montgomery County, Maryland (Montgomery County), Montgomery County Police Department (MCPD), Montgomery County Sheriff's Office (MCSO), and Maxwell C. Uy in his official capacity as Sheriff of Montgomery County, Maryland.

### INTRODUCTION

Using law enforcement as a means of depriving Americans of their constitutionally protected rights is law-enforcement misconduct that is both unlawful and subject to injunction pursuant to 34 U.S.C. § 12601 (Section 12601). This includes using police officers or sheriff's deputies to implement an unconstitutional limitation on constitutional rights, such as the right to keep and bear arms. The right of the people to keep and bear arms is among those fundamental rights necessary to our system of ordered liberty. *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 778 (2010). The Second Amendment protects the right of law-abiding citizens to bear arms in

public for lawful purposes such as self-defense. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 9-10 (2022); *Wolford v. Lopez*, 146 S. Ct. 2032, 2040 (2026); *Kipke v. Moore*, 165 F.4th 194, 207 (4th Cir. 2026) (holding that the Second Amendment protects "the carrying of guns in public"). Under the standard common-law rule regarding access to private property held open to the public, everyone, including those lawfully carrying firearms, may enter unless expressly prohibited from doing so. *Wolford*, 146 S. Ct. at 2040-41. A law that bans citizens from carrying firearms into "places that people routinely visit in the course of their daily routines . . . hobbles what the Second Amendment protects: the right of Americans to carry arms for self-defense as they go about their daily lives," and is therefore unconstitutional. *Id*. at 2041.

On July 27, 2026, Montgomery County enacted Expedited Bill No. 23-26 (Bill 23-26). Numerous provisions of Bill 23-26 violate the Second Amendment. Bill 23-26's sweeping prohibitions effectively prevent carrying of firearms throughout much of the County without a legitimate purpose. Bill 23-26's 100-yard buffer zone imposes a burden on the right to bear arms with no historical tradition to support it. And Bill 23-26's ban in places of worship infringes a Second Amendment right to defend one's self in a place where the history and tradition have secured the right to carry. Montgomery County law enforcement officers are charged with enforcing these unconstitutional restrictions and are doing so. That implementation is law enforcement misconduct unlawful pursuant to Section 12601. The United States brings this action to vindicate the constitutional rights of the law-abiding citizens of Montgomery County.

**ARGUMENT**

I.    **Standard for Injunctive Relief under Fed. R. Civ. P. 65.**

A party seeking a preliminary injunction must show that: (1) it is likely to succeed on the merits, (2) there is a risk of irreparable harm absent injunctive relief, (3) the balance of equities tips in its favor, and (4) the broader public interest supports an injunction. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). When the government is the defendant, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

II.    **The United States Is Likely to Prevail on the Merits.**

The United States is likely to succeed on the merits because Bill 23-26 is presumptively unconstitutional, Defendants cannot rebut this presumption, and Bill 23-26's implementation constitutes a pattern or practice of law enforcement misconduct.

A.    **There can be no serious dispute that Bill 23-26 burdens the right protected by the Second Amendment's plain text.**

Applying the Second Amendment requires a two-step analysis. First, a court must determine whether the statute burdens the conduct protected by the Second Amendment's plain text, the keeping and bearing of arms by the people. *Bruen*, 597 U.S. at 44. Second, if so, a court must determine whether the statute is consistent with our historical tradition of firearm regulation. *Id.* In *Wolford*, the Supreme Court clarified step one of the *Bruen* test:

> [The analysis required in a Second Amendment case] involves two steps. First, a court must determine whether the law before it clashes with the plain text of the Amendment's language. This inquiry entails three subsidiary questions. First, does the law apply to the people—which is to say, to all members of the political community? Second, does it concern any form of Arms, i.e., any weapon customarily used for offensive or defensive purposes? Third, does the law place any restrictions on either the keeping (i.e., possession) or the bearing (i.e., carrying) of arms?
>
> If a challenged law falls within the plain text of the Second Amendment, *it is presumptively unconstitutional*—which means that it may violate the preexisting

3

right that the Amendment codified.  But because that right was not in every way coterminous with the Amendment's literal language, further analysis may be needed.  Specifically, the relevant government—federal, state, or local may be able to show that its challenged law did not infringe the historical understanding of the codified right.

146 S. Ct. at 2043-2044 (cleaned up; citations and quotation marks omitted; emphasis added).

Thus, step one of the *Bruen* test requires a court to ask three questions:

A.  Does the law apply to the people?

B.  Does it concern any form of arms?

C.  Does the law place any restrictions on either the possession or carrying of arms?

In this case, step one of the *Bruen* test is easily met.  No one can reasonably dispute that: (1) the individuals who are subject to the burdens of Bill 23-26 are among the "people;" (2) Bill 23-26 applies to arms; and (3) Bill 23-26 restricts the possession or carrying of arms.  Bill 23-26's restrictions on where arms may be possessed and carried thus limit rights protected by the Second Amendment.[1]  In *Kipke*, the Fourth Circuit stated that "[w]hen analyzing the sensitive places doctrine and determining where it fits within the *Bruen* framework . . . we hold that this doctrine goes to the 'proposed course of conduct,' namely, the carrying of guns in public, which the Second Amendment protects." 165 F.4th at 207.

### B.  Defendants Cannot Meet Their *Bruen* Step-Two Burden.

The burden under *Bruen* step one is on the party attacking the law (here, the United States with respect to law enforcement misconduct in the implementation of the law) and the "history and tradition" burden under step two is on the government defending the law (here, the

---

[1] With some very limited exceptions, Bill 23-26 prohibits the sale, transfer, possession or transportation of handguns, rifles, ammunition, or "major components" in or within 100 yards of places of public assembly.  "[F]or the right to bear arms to have meaning, the Amendment's text must carry an implicit, corollary right to bear the components or accessories necessary for the ordinary functioning of a firearm." *Duncan v. Bonta*, 133 F.4th 852, 866 (9th Cir. 2025). And in *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014), the court held that the right to possess firearms implies a corresponding right to ammunition.  Thus, Bill 23-26's prohibition on the possession of components and ammunition is presumptively unconstitutional under *Bruen* step one, too.

4

Defendants). *Hanson v. D.C.*, 120 F.4th 223, 232 (D.C. Cir. 2024), *abrogated on other grounds by Wolford v. Lopez*, 146 S. Ct. 2032 (2026). A defendant's burden under step two is an affirmative defense to any presumption that arises at step one, and a plaintiff "need not anticipate and negate affirmative defenses" in its complaint. *Cunningham v. Cornell Univ.*, 604 U.S. 693, 702 (2025) (citing *Perry v. Merit Systems Protection Bd.*, 582 U.S. 420, 435 n. 9 (2017)). Thus, the United States has completely met its burden under *Bruen* step one and the burden shifts to Defendants for step two.

At *Bruen* step two, the Court's job is to determine whether "a firearm regulation is consistent with this Nation's historical tradition." *Kipke*, 165 F.4th at 206 (quoting *Bruen*, 597 U.S. at 17). "A variety of sources, including scholarship, may aid this inquiry." *Wolford*, 146 S. Ct. at 2044. The best evidence is historical analogues. *Id.* Analogues that were widely adopted and accepted are more persuasive. *Id.* A court must consider whether the analogues are "relevantly similar" to the modern law. *Id.* Regarding this inquiry, the "how" and "why" questions are important. *Id.* Did the proposed analogue impose a similar restriction and was it similarly justified? *Id.* An analogue need not be a "dead ringer" or "historical twin." *Id.* This is especially true when the modern law addresses a situation that could not have arisen when the Second or Fourteenth Amendment was adopted. *Id.*

Defendants cannot meet the step-two burden because Bill 23-26 unconstitutionally restricts this protected right to carry in three ways: (i) Bill 23-26 effectively abrogates the right to carry; (ii) Bill 23-26's 100-yard buffer zone imposes a burden on the right to bear arms with no historical tradition to support it; and (iii) at a minimum, Bill 23-26's ban in places of worship violates a Second Amendment right to defend one's self in an area where the history and tradition have secured the right to carry.

5

  i.  **Bill 23-26 effectively abrogates the right to carry.**

Bill 23-26's sweeping restriction—a broad list of places of assembly, plus a ban on carrying within 100 yards of those places—effectively prevents public carry throughout the jurisdiction.[2] It cannot be said that Bill 23-26 effective nullification of the rights to bear arms has any legitimate purpose.

The total area of Montgomery County where Bill 23-26 prohibits possession of firearms, i.e., the "Exclusion Zone," is enormous.    It encompasses literally thousands of locations. Montgomery County GIS Open Data shows that Montgomery County is home to:[3]

605 houses of worship, https://bit.ly/3OLbfvG,

693 public parks, https://bit.ly/3qjHLfb (not including four federal parks and any privately owned "parks"),

42 public recreation centers, https://bit.ly/3WB1VhL,

10 colleges and universities, https://bit.ly/3Csn5Yr,

45 post Offices, https://bit.ly/4h8YAhZ,

38 fire stations, https://bit.ly/4gfCxVy,

15 public swimming pools, https://bit.ly/4awPtW2,

13 Metro stations, https://bit.ly/4aySiG0, and

11 MARC commuter train locations, https://bit.ly/3Cdo3b7.

---

[2] It may well be permissible to ban firearms in some places covered by the ordinance, such as polling places.  Some historical laws did restrict the possession of firearms near polling places, but those restrictions imposed a limited burden, confined to one type of place and to just one day every election cycle justified by the interest in securing elections from violence.  If the County wants to re-enact those restrictions, it can do so and courts can then consider the validity of those laws.  The Supreme Court has upheld a no-political-speech buffer zone around polling places, *see Burson v. Freeman*, 504 U.S. 191 (1992), but that does not mean it would uphold a similar buffer zone around other types of locations.  The Second Amendment is not a second-class right subject to different rules.  As Bill 23-26 stands, it is an unconstitutional infringement of the right to bear arms.

[3] Much of these data is set forth in the complaint in *Barreto v. Montgomery County, Maryland*, Case No. 8:26-cv-2912 (D. Md.) (*Barreto*).

This list is merely illustrative.  It does not include many of the places in the Exclusion Zone such as libraries,  or "exhibition facilities" such as fairgrounds and conference centers.  Nor does the list include areas within 100 yards of government buildings, polling places, courthouses, or the legislative assembly.

Not surprisingly, this comprehensive ban on firearms prevents citizens from possessing firearms as a practical matter throughout most of the public (and many private) spaces in Montgomery County as they go about their daily lives.  The plaintiffs in *Barreto* developed an interactive webpage consisting of a map of some of the areas that qualify as a "place of assembly" as that term is defined by Bill 23-26 (Fetterman Map).  The interactive map may be accessed at https://public.johnlettman.com/montgomery/.  Every location colored on the map represents a place encompassed by the definition of "a place of public assembly."  Specific details of each parcel, including its address and classification according to County records, can be shown by dragging a cursor across individual areas.  A non-interactive copy of the Fetterman Map is shown below:



The Fetterman Map shows that there are at least 10,000 parcels comprising over 7,900 acres (over 26 percent of the County), that fall within the Exclusion Zone. The area calculations *exclude* the 100-yard buffer zones. Thus, the area affected by the law is considerably greater than 26 percent of the entire County.

Municipalities such as Gaithersburg contain areas within the Exclusion Zone with hundred-yard buffers that will repeatedly and unpredictably include countless ordinary places of commerce, private and public property open to the public and privately owned parking lots open to the public. As a practical matter, the enormous scope of the Exclusion Zone makes it almost impossible for a citizen to walk through town to shop, to dine, or engage in any other common activity of daily life without likely entering the Exclusion Zone multiple times in a single trip and thereby becoming a criminal without ever intending to do so (or even knowing that he has done so). Accordingly, Bill 23-26 is effectively a ban on carry in Montgomery County enforced through

the threat of arrest by law enforcement.  The burden imposed by this law is so extensive that the law is transparently a pretextual effort to make exercising the constitutional right to bear arms impracticable, if not impossible.

    ii.       **Bill 23-26's 100-yard buffer zone imposes a burden on the right to bear arms with no historical tradition to support it.**

For all practical purposes, Bill 23-26 prevents law-abiding citizens from carrying a firearm as they go about their daily lives.  Bill 23-26 includes an exception for possession within one's own home, but there appears to be no exception for someone who wants to step outside his home with his gun.  People might not know, while walking around in public, whether they are entering a buffer zone.  While it will usually be obvious when someone is entering a courthouse or legislative building or other such sensitive place, it will not be obvious when one is entering a buffer zone.  The buffer zones cover such a substantial area of Montgomery County that the restriction of the constitutional right to carry becomes unavoidable.

Consider a person who owns a firearm and lives within 100 yards of a park.  Subsection 57-11(b)(3) says the law does not apply so long as the firearm stays "in the person's own home." But the person becomes a criminal if he steps into his own backyard with a firearm or a "component" of a firearm.[4]  Consider a church that has an adjacent parsonage.  The pastor is a criminal while walking to his place of employment.  Moreover, the pastor is a criminal even in his own home if he has a spare magazine because the exception within one's own home applies only to firearms and ammunition; the exception does not apply to "components."

---

[4] Bill 23-26 not only regulates handguns and rifles, but ammunition and "major components" of firearms within 100 yards of statutorily defined places of public assembly.  At no point does the statute define or even attempt to clarify the meaning of "major components."  Does this term encompass a barrel?  A trigger?  A pistol grip?  Does the term only cover portions of a firearm as large as the upper receiver, or does it encompass parts as small as a detent pin holding a safety selector switch in place? Is a part as innocuous as an optic one of these major components?  Scopes, sights, and other items may fall within the definition.  Reasonable persons will invariably disagree on the line between an illegal "major component" and a legal "minor component."

In *Wolford v. Lopez*, 146 S. Ct. 2032 (June 25, 2026), the Supreme Court addressed a similar Hawaiian exclusion zone that effectively prevented citizens from carrying firearms while going about their daily lives. The Court presented a detailed hypothetical following the daily life of a young Hawaiian who wanted to carry a firearm on her daily errands. The Court followed her through a gas station, drug and grocery stores, a restaurant, a place of employment and concluded that, ". . . by the end of an ordinary day, our hypothetical young woman could be a criminal at least six times over." *Id*. at 2047-2049. The Court held: "This regime hobbles what the Second Amendment protects: the right of Americans to carry arms for self-defense as they go about their daily lives. We hold that the law is unconstitutional." *Id*. at 2041.

Montgomery County's law suffers the same defect as Hawaii's law in *Wolford* – it prevents a hypothetical law-abiding young woman with a valid CCW permit from attending to daily life while carrying a firearm. If she is going to church or if her various destinations are within a city block (a typical city block is about 100-110 yards) of a park, church, or the many other areas of the Exclusion Zone, she would be a criminal. Even worse, every time she walks by a library (or its parking lot), she is again a criminal. When she steps out of her car onto a sidewalk and walks down a sidewalk that is about a block away from the neighborhood swimming pool, she is a criminal.

Bill 23-26 actually is much more restrictive than the offending law in *Wolford*. In Hawaii, a citizen could hope to get a property owner's permission to carry. Not so in Montgomery County. The law makes no exception for situations where a person obtains a property owner's express permission to carry on their property. The person is still a criminal. The owners of churches, recreational facilities, etc. are not allowed to grant their visitors permission to carry a firearm. Bill 23-26 is flagrantly contrary to the Supreme Court's holding in *Wolford*.

Similarly, Bill 23-26 criminalizes conduct when individuals may not even know if they are in a buffer zone.  Bill 23-26 does not make clear what areas fit within its exclusion zone.  What is a "park"?  A large backyard fits within some definitions.  What is a "place of worship"?  It could arguably include any place where people are worshiping, such as home Bible studies and prayer meetings.  What is a "recreational facility"?  Does it also include a comedy club?

### iii.    Bill 23-26's restriction on the types of places where people may carry firearms exceed what is permitted by history and tradition.

#### a.    Places of Worship.

The ban on firearms in places of worship, where the place of worship welcomes firearms, places a uniquely unsupportable burden on the right to bear arms.  If there is any place where people are entitled to feel safe and to defend themselves, it is at a place of worship. It is a historically unsupportable burden to require people exercising their First Amendment right to assemble for worship to give up exercising their Second Amendment right to defend themselves. Bill 23-26 unconstitutionally forces individuals who are practicing their religion by congregating with others of like faith to worship together—an activity that is an important spiritual obligation in some faiths—to refrain from possessing and carrying adequate means of self-defense.  *See Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 322 (N.D.N.Y. 2022), *aff'd in part, vacated in part, remanded sub nom. Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024) (holding that a similar "regulation treads too close to infringing on one's First Amendment right to participate in congregate religious services").

History does not support banning firearms in places of worship that welcome them.  Not only is there no founding-era tradition of banning firearms in places of worship, but early American laws affirmatively required the faithful to bring arms to their places of worship.  In summary,

11

Defendants have no hope of prevailing under *Bruen* step two. The nation has no "tradition of banning firearms in places of worship." *Wolford v. Lopez*, 116 F.4th 959, 996 (9th Cir. 2024), *rev'd on other grounds*, 146 S. Ct. 2032 (2026).

Bill 23-29 does not find applicable historic or traditional support for its prohibitions on firearms in many of the statutes' designated spaces. And, there is no founding-era law analogous to Bill 23-26's 100-yard buffer zone.

### b.   Parks.

The relevant historical record confirms that in the founding era, governments were not broadly restricting firearms on public lands, urban green spaces, and other locations that could serve as legitimate historical analogues to Montgomery County's prohibition in parks. *Kipke*, 165 F.4th at 243 (Agee, J., dissenting) (cleaned up; citation and quotation marks omitted). Plaintiff acknowledges that the *Kipke* majority held otherwise, but *Kipke* was wrongly decided in this respect, and Plaintiff brings this action seeking to have that part of *Kipke's* holding overturned.

### c.   Libraries.

Libraries obviously existed at the time of the founding, and by 1850, the Census reported 1,217 public libraries in the United States. *See* Dep't of Interior, 1850 Census: Compendium of Seventh Census, tbl CLXVII (1854) available at https://bit.ly/4w5zUxH. Yet no state categorically banned firearms at libraries. Thus, Bill 23-26's ban is not consistent with the nation's historical tradition.

### d.   Recreational Facilities.

Despite the undeniable presence of places used for recreational purposes at the founding, there is no evidence of any founding-era laws prohibiting firearms in those places. *Wolford v.*

*Lopez*, 125 F.4th 1230, 1243 (9th Cir. 2025) (Vandyke, J., dissenting from denial of rehearing en banc).

### e. Multipurpose Exhibition Facilities.

There are no founding-era regulations analogous to a prohibition on carrying firearms at public gatherings of this kind.  *See Antonyuk*, 639 F. Supp. 3d at 335.

### C. Montgomery County's Law Enforcement Officers Enforce Bill 23-26's Unlawful Prohibitions.

MCPD is a law enforcement agency within Montgomery County.  MCPD is responsible for enforcement of Montgomery County laws.  *See* Montgomery County Code (MCC) § 35-8. MCSO is a law enforcement agency established by the Constitution of the State of Maryland and Maryland statutes.  *See* Md. Code Pub. Safety § 1-101(c)(1)(ii)(7); Md. Code Crim. Pro. § 2-101(c)(10)-(11).  MCSO is authorized to enforce laws of Montgomery County.  *See* MCC § 35-23; *Soper v. Montgomery Cnty*., 449 A.2d 1158, 1161 (Md. 1982) ("[O]rdinarily sheriffs retain the powers they possessed at common law including conserving public peace, preserving public order, preventing and detecting crime, enforcing criminal law . . . [and] those powers are concurrent with the powers now ordinarily exercised by police officers.").  While MCPD is the primary law enforcement agency within Montgomery County, *see Soper*, 449 A.2d at 1164-65, MCSO retains its traditional powers to enforce criminal laws and make arrests.  Defendant Uy is the Sheriff of Montgomery County, Maryland.  He is an elected Constitutional officer of the State of Maryland.  *See* Md. Const. art. IV, § 44.  In his capacity as the Sheriff of Montgomery Count, Defendant Uy is responsible for appointing deputy sheriffs who, in turn, have law enforcement powers within Montgomery County.  *See* Md. Code. Courts & Jud. Proc. § 2-329(d); Md. Code Pub. Safety § 1-101(c)(1)(ii)(7); Md. Code Crim. Pro. § 2-101(c)(10)-(11).

Montgomery County law enforcement officers enforce the Bill 23-26. Indeed, these law enforcement officers have an affirmative duty to use their best efforts to enforce the Unlawful Prohibitions. In the case of a newly enacted law such as this one, it "would be unreasonable to assume that [Montgomery County] adopted [the law] without intending that it be enforced." *Mobil Oil Corp. v. Att'y Gen. of Com. of Va.*, 940 F.2d 73, 76 (4th Cir. 1991) (internal citations and quotation marks omitted). When the Montgomery County law enforcement officers enforce Bill 23-26, they are engaging in a pattern or practice of law enforcement misconduct that deprives individuals of their federal civil rights protected under the Second Amendment.

### D. The United States Is Entitled to Injunctive Relief.

Under 34 U.S.C. § 12601(a), it is unlawful (1) for a "governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority;" (2) to "engage in a pattern or practice of conduct by law enforcement officers;" (3) that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States. The plain text authorizes the United States to obtain injunctive relief against violations of § 12601(a). 34 U.S.C. § 12601(b). The "cardinal canon" of statutory interpretation is that a "legislature says in a statute what it means and means in a statute what it says there" regardless of whether "*legislative history points to a different result.*" *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-254 (1992) (emphasis added). Accordingly, when the words of a statute are unambiguous, this first canon is also the last and the "judicial inquiry is complete." *Id.* at 254 (citations and internal quotation marks omitted). The plain text of Section 12601 mandates that any time law enforcement officers engage in a pattern or practice of conduct that deprives citizens of their constitutional rights, the United States is authorized to bring an action to redress the violation.

14

Pursuant to Section 12601, the United States is authorized to seek an injunction against "a governmental authority whose own official policy causes it to engage in a pattern or practice of conduct by law enforcement officers that deprives persons of federally protected rights." *See Cnty. of Maricopa*, 889 F.3d at 653; *see also United States v. Bd, of Educ. for Sch. Dist. of Phila.*, 911 F.2d 882 (3d Cir. 1990) (providing that where a governmental defendant announces a discriminatory policy, then the policy constitutes a "pattern or practice"). Enforcing an unconstitutional law, by definition, deprives persons of their constitutional rights. And acts of the legislative body of a state represent the "official policy" of that state. *Cnty. of Maricopa*, 889 F.3d at 652. So, too, must Montgomery County's mandate to its law enforcement through Bill 23-26 represent the official policy and therefore the practice of the County's law enforcement. Accordingly, Section 12601 authorizes the United States to seek to enjoin the Defendants' conduct.

Montgomery County is a governmental authority, as that term is used in Section 12601(a). When the Montgomery County law enforcement officers enforce the Bill 23-26, they are acting as agents of and on behalf of Montgomery County. The pattern or practice of conduct by law enforcement officers described above deprives persons of rights, privileges, or immunities secured or protected by the Constitution. Therefore, Defendants are in violation of 34 U.S.C. § 12601(a).

Defendant's violation of 34 U.S.C. § 12601(a) entitles the United States to injunctive relief pursuant to 34 U.S.C. § 12601(b) (Section 12601(b)):

> Whenever the Attorney General has reasonable cause to believe that a violation of paragraph (1)[5] has occurred, the Attorney General, for or in the name of the United States, may in a civil action obtain appropriate equitable and declaratory relief to eliminate the pattern or practice.

The United States brings this action pursuant to the authority set forth in Section 12601(b) to remedy Defendants' violation of Section 12601(a).

---

[5] [*sic*] This should state "paragraph (a)."

III.     **The United States Meets the Irreparable Harm Factor.**

The Fourteenth Amendment empowers the United States to enforce constitutional rights against the States, *see* U.S. Const. Amend. XIV, § 5, and a loss of constitutional rights amounts to irreparable injury, *see Centro Tepeyac v. Montgomery Cnty*., 722 F.3d 184, 190 (4th Cir. 2013). Accordingly, "[w]hen an alleged deprivation of a constitutional right is involved, . . . most courts hold that no further showing of irreparable injury is necessary."  11A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2948.1 (3d ed. 1998).  The deprivation of Second Amendment rights *per se* causes irreparable injury.  *See Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023).  The United States also suffers harm in Defendants' unlawful violation of a federal statute, Section 12601.  *See Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000); *Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 430-431 (1976). Moreover, the harms that Bill 23-26 imposes on the people of Montgomery County are not academic or theoretical.  The law imposes severe hardships on real people.  *See* the Declarations of Aaron Lobel, Bayla Y. Shapiro, Connie Lindenauer, David L. Stone, Erik Lindenauer, Jack Leeb, Lynn R. Job, Rabbi J. Menashe Shapiro, Michael M. Medina, Moses Albert, and Samuel Brainin attached hereto.

IV.     **The United States Prevails on the Final Two Factors.**

The remaining factors decisively tip in Plaintiff's favor.  The balance of equities favors the Plaintiff because Montgomery County is not likely to be harmed when enforcement of an unconstitutional law is enjoined.  *See Centro Tepeyac*, 722 F.3d at 191.  "[I]f the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment."  *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee*, 274 F.3d 377, 400 (6th Cir. 2001).  Montgomery County's statute

harms a constitutional right and it suffers no harm, so the balance of equities weigh in the Plaintiff's favor for enjoining the bill's enforcement. "[U]pholding constitutional rights surely serves the public interest." *Centro Tepeyac*, 722 F.3d at 191 (*quoting Giovani Carandola, Ltd. V. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). "[T]here is no valid state interest in enforcing unconstitutional laws." *Brown v. Yost*, 133 F.4th 725, 738 (6th Cir. 2025). Therefore, the public interest also leans sharply in Plaintiff's favor when Montgomery County law enforcement officers enforce the Unlawful Prohibitions.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully moves the Court to enter a preliminary injunction barring enforcement of the Unlawful Prohibitions. A proposed order is attached.

Respectfully submitted this 3rd day of August 2026.

HARMEET K.  DHILLON
Assistant Attorney General
Civil Rights Division

JESUS OSETE
Principal Deputy Assistant Attorney General

R.  JONAS GEISSLER
Deputy Assistant Attorney General

BARRY K. ARRINGTON
Acting Chief
Second Amendment Section

*/s/ Gregory Dolin*
GREGORY DOLIN
Senior Counsel

WILLIAM J.  HANRAHAN
PATRICK TODD
KEITH GAINES
Trial Attorneys
Second Amendment Section

United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C.  20530
Telephone:(202) 304-8447
E-Mail:  gregory.dolin@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for the United States, certifies that this brief contains

17 pages, which complies with the page limit of Local Rule 105.3.


*/s/ Gregory Dolin*
GREGORY DOLIN
Senior Counsel