**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MONTGOMERY COUNTY, MARYLAND, *et al.*,<br><br>Defendants. | : | Case No. 8:26-cv-03025-TDC |

**CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS COMPLAINT, AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS


**TABLE OF AUTHORITIES ............ ii**

**I. INTRODUCTION ............ 1**

**II. PERTINENT FACTS AND PROCEDURAL BACKGROUND ............ 1**

A. The County's Long-Standing Law On Weapons, Including Firearms. ............ 1

B. This Court's Denial Of Injunctive Relief In Related Case, Maryland Shall Issue, Inc. v. Montgomery County, Maryland, Civil Action No. 8:21-1736-TDC. ............ 6

**III. APPLICABLE LEGAL STANDARDS ............ 8**

A. Motion To Dismiss For Lack Of Subject Matter Jurisdiction And Failure To State A Claim ............ 8

B. Motion For Preliminary Injunction ............ 8

**IV. ARGUMENT ............ 9**

A. The Complaint Should Be Dismissed With Prejudice Because The United States Lacks Standing And Has Failed To State A Claim Upon Which Relief Can Be Granted. ............ 9

1. The United States Lacks Standing. ............ 9

2. The Complaint Fails To Allege A Pattern Or Practice Of Conduct By Law Enforcement Officers As Required Under Section 12601. ............ 13

3. Neither The Montgomery County, Maryland Police Department Nor The Montgomery County, Maryland Sheriff's Office Is A Legal Entity Subject To Suit. ............ 15

B. The United States Cannot Meet Its Burden To Demonstrate Entitlement To Injunctive Relief. ............ 16

1. The United States *Cannot* Demonstrate a Substantial Likelihood of Prevailing on the Merits. ............ 17

2. The United States Will Not Suffer Irreparable Harm If The Court Does Not Issue A Preliminary Injunction. ............ 26

3. The Balance Of The Equities And The Public Interest Weigh In Favor Of Denying The United States' Request For A Preliminary Injunction. ............ 28

**V. CONCLUSION ............ 29**

## TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez*, 585 U.S. 579 (2018) ........ 28

*Andrews v. State*, 50 Tenn. 165 (Tenn. 1871) ........ 23

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........ 8, 14

*Ass'n of Cmty. Cancer Cntrs. v. Azar*, 509 F. Supp. 3d 482 (D. Md. 2020) ........ 28

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........ 8, 15

*Benisek v. Lamone*, 585 U.S. 155 (2018) (per curiam) ........ 29

*Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) ........ 25

*Coster v. Maryland*, No. GLR-21-65, 2021 WL 5605027 (D. Md. Nov. 30, 2021) ........ 16

*Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100 (2025) ........ 10

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........ 18

*English v. State*, 35 Tex. 473 (Tex. 1872) ........ 23

*Goldstein v. Hochul*, 680 F. Supp. 3d 370 (S.D.N.Y. 2023) ........ 24

*Hill v. State*, 53 Ga. 472 (Ga. 1874) ........ 23

*Hines v. French*, 852 A.2d 1047 (Md. App. 2004) ........ 15, 16

*Hodge v. Stephens*, No. 12–cv–01988–AW, 2013 WL 398870 (D. Md. Jan. 31, 2013), *aff'd*, 533 F. App'x 344 (4th Cir. 2013) ........ 16

*Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691 (4th Cir. 1994) ........ 8

*JAK Productions, Inc. v. Bayer*, 616 Fed. Appx. 94 (4th Cir. 2015) ........ 9, 20

*Jarvis v. Montgomery Cty.*, No. 11-cv-00654-AW, 2011 WL 5547979 (D. Md. Nov. 14, 2011) ........ 16

*Kipke v. Moore*, 165 F.4th 194 (4th Cir. 2026) ........ 25

*Maages Auditorium v. Prince George's Cnty., Md.*, 4 F. Supp. 3d 752 (D. Md. 2014), *aff'd sub nom. Maages Auditorium v. Prince George's Cnty., Maryland*, 681 Fed. Appx. 256 (4th Cir. 2017) ........ 9

*Maryland Shall Issue, Inc. v. Montgomery County, Maryland*, 680 F. Supp. 3d 567 (D. Md. 2023) ............ passim

*Maryland v. King*, 567 U.S. 1301 (2012) ............ 28

*Matter of Rounds*, 279 A.3d 1048 (Md. App. 2022)............ 3

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) (per curiam) ............ 8

*McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010)............ 18

*Mountain Valley Pipeline, LLC v. 6.56 Acres*, 915 F.3d 197 (4th Cir. 2019) ............ 26

*Munaf v. Geren*, 553 U.S. 674 (2008)............ 8

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009)............ 8

*New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022)............ 2, 3, 18, 19

*Nguyen v. Bonta*, 140 F.4th 1237 (9th Cir. 2025)............ 17

*Nken v. Holder*, 556 U.S. 418 (2009) ............ 28

*Pasadena City Bd. Of Educ. v. Spangler*, 427 U.S. 424 (1976) ............ 26, 27

*Pursuing America's Greatness v. FEC*, 831 F.3d 500 (D.C. Cir. 2016............ 28

*Revene v. Charles Cty. Comm'rs*, 882 F.2d 870 (4th Cir. 1989)............ 16

*Rhodes v. Montgomery Cnty. Dep't of Corrs. & Rehab.*, No. 12-03172, 2013 WL 791208 (D. Md. Mar. 1, 2013)............ 16

*Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765 (4th Cir. 1991) . 8

*Roswell v. Mayor & City Council of Baltimore*, 671 F. Supp. 3d 607 (D. Md. 2023) ............ 27

*Schall v. Martin*, 467 U.S. 253 (1984)............ 28

*Soper v. Montgomery Cty.*, 449 A.2d 1158 (Md. 1982) ............ 14

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ............ 10

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ............ 10

*U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337 (4th Cir. 2009)............ 8

*United States v. California*, No. 8:26-cv-01697, 2026 WL 2004372 (C.D. Cal. July 9, 2026)... 10, 12, 13, 29

*United States v. Martinez*, 169 F.4th 1147 (9th Cir. 2026) ... 17

*United States v. Morrison*, 529 U.S. 598 (2000) ... 28

*United States v. Rahimi*, 602 U.S. 680 (2024) ... 19

*United States v. Salerno*, 481 U.S. 739 (1987) ... 28

*Upman v. Howard County Police Dep't*, RDB-09-1547, 2010 WL 1007844 (D. Md. Mar. 17, 2010) ... 15

*Vermont Agency of Nat. Res. v. United States ex re. Stevens*, 529 U.S. 765 (2000) ... 26

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) ... 8, 26

*Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024) ... 21, 24

*Woods v. City of Greensboro*, 855 F.3d 639 (4th Cir. 2017) ... 15

**Statutes**

34 U.S.C. § 12601 ... 1, 9, 10, 13

**Rules**

Fed. Rule Civ. Proc. 8 ... 14

**Constitutional Provisions**

U.S. Const. art. III ... 9

## I. INTRODUCTION

The United States' theory in this case, if accepted, is that by enacting 34 U.S.C. § 12601, Congress suspended altogether the notion of state and local sovereignty, and sweepingly bestowed upon the Justice Department the power to challenge any state or local criminal law, simply because it may disagree with how it theoretically and prospectively may be enforced. Here, the United States alleges that "[n]umerous provisions of [Montgomery County] Bill 23-26 violate the Second Amendment." Compl., ECF No. 1 at ¶ 3, suggesting that "[f]or all practical purposes, it prevents law-abiding citizens from carrying firearms as they go about their daily lives." *Id*. at ¶ 30. It is the terms of Bill 23-26E itself—not any particular pattern or practice of enforcement by any particular law enforcement officers, actual or hypothetical—that the Justice Department claims is depriving individuals of a constitutional right. Because the United States is not challenging a "pattern or practice of conduct by law enforcement officers," 34 U.S.C. § 12601(a), its claim is not cognizable under Section 12601, and the Complaint should be dismissed in its entirety with prejudice. To the extent, *arguendo,* there existed a cognizable claim, Bill 23-26E does not implicate or violate the Second Amendment. In any event, there is nothing new in that Bill or in the state of the law that suggests the need for extraordinary emergency relief.

## II. PERTINENT FACTS AND PROCEDURAL BACKGROUND

### A. The County's Long-Standing Law On Weapons, Including Firearms.

The County enacted Chapter 57, "Weapons," of the County Code in 1981. Almost 30 years ago, in 1997—three years *after* 34 U.S.C. § 12601 was codified, the County enacted Section 57-7A, prohibiting (with certain enumerated exceptions) the sale, transfer, possession, or transport of a firearm "in or within 100 yards of a place of public assembly." Ex. 1, 1997 Laws Montgomery Cnty. Ch. 14 (Bill 4-97) ("Bill 4-97") at 5-6. Bill 4-97 defined a "place of public assembly" to include, among other places, a place of worship, a government owned park, a public library, and

a government owned or operated recreational facility, as well as "all property associated with the place, such as a parking lot or grounds of a building." *See id*. In 2001, Section 57-7A became 57-11—the provision that the United States now challenges. Ex. 2, 2001 Laws Montgomery Cnty. Ch. 11 (Bill 2-01) ("Bill 2-01"). Bill 2-01 maintained places of worship, government owned parks, public libraries, government owned or operated recreational facilities, and "all property associated with the place, such as a parking lot or grounds of a building" as places of public assembly. *See id*. at 2, 3, and 4.

In 2021, the County responded to the increasing use of "ghost guns"—homemade unserialized (and therefore untraceable) firearms, which can easily be assembled from kits or built using 3D printers by individuals without any required background check—by enacting Bill 4-21. *See* Ex. 3, Council Staff Action Packet. Bill 4-21 became effective on July 16, 2021. *See* Ex. 4, 2021 Laws Montgomery Cnty. Ch. 7 (Bill 4-21) ("Bill 4-21"). Bill 4-21 added a definition of "major component"—a definition the United States claims does not exist[1]—to mean "with respect to a firearm: (1) the slide or cylinder or the frame or receiver; and (2) in the case of a rifle or shotgun, the barrel." *Id*. at 4. Bill 4-21 also expanded a place of public assembly to include "a place where the public may assemble, whether the place is publicly or privately available, including" and among other things, parks, places of worship, schools, libraries, recreational facilities, and multipurpose exhibition facilities. *Id*. at 4-5.

On June 23, 2022, the United States Supreme Court decided *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022) (hereafter "*Bruen*"). The *Bruen* Court articulated a new test to evaluate whether governmental firearms regulations pass muster under the Second Amendment. The Court stated that banning firearms in "sensitive locations" is constitutionally

---

[1] *See* Mem. at 9, n. 4 ("At no point does the statute define or even attempt to clarify the meaning of 'major components.'").

permissible, and identified five locations—schools, legislative assemblies, government buildings, polling places, and courthouses—as "sensitive places" where weapons may be totally prohibited. The Court also contemplated that other locations where weapons were historically banned—or the modern counterparts of those locations—could similarly qualify as "sensitive places."[2]

*Bruen* led the County to enact changes to Chapter 57, designed to adhere to the new guidance from the U.S. Supreme Court. Specifically, the County enacted Bill 21-22E, effective November 28, 2022, wherein it narrowed its definition of "place of public assembly" to align with *Bruen*. *See* Ex. 5, 2022 Laws Montgomery Cnty. Ch. 36 (Bill 21-22) ("Bill 21-22E"). Bill 21-22E continued the existing prohibition of carrying a firearm within 100 yards of a place of public assembly but removed the statement that a place of public assembly was a place "where the public may assemble." *See id.* at 3. The Bill also removed the statement that a place of public assembly "included" locations listed. *See id*. By removing "included," Bill 21-22E narrowed its scope. Pertinent to this "sensitive places" case (Compl., ECF No. 1, ¶ 20), Bill 21-22E continued to include parks, places of worship, schools, libraries, recreational facilities, and multipurpose exhibition facilities—as well as all property associated with the place, such as a parking lot or grounds of a building—as places of public assembly. *See id*. at 3-4. Bill 21-22E also added several "sensitive places" that *Bruen* expressly indicated were locations where weapons could be constitutionally restricted. *See id*.

Prior to *Bruen*, Maryland required a person to demonstrate "good and substantial reason" to receive a wear-and-carry gun permit. Immediately after *Bruen,* Maryland Governor Larry Hogan instructed the Maryland State Police to no longer enforce this requirement.[3] In the weeks

---

[2] *Bruen* will be discussed and cited in more detail below.

[3] Also, after *Bruen*, the Appellate Court of Maryland struck down the "good and substantial reason" requirement. *See Matter of Rounds*, 279 A.3d 1048 (Md. App. 2022).

after Governor Hogan's instruction, the number of applications for concealed carry permits received by Maryland State Police increased eleven-fold.[4] *See* Ex. 7, Racial Equity and Social Justice (RESJ) Impact Statement regarding Bill 21-22E. Since concealed carry permit holders no longer would have to demonstrate any justification for a concealed carry permit, Bill 21-22E added language to prevent the carry of a concealed firearm within 100 yards of a place of public assembly. *See* Ex. 8, Report of Staff of Montgomery County Council, Expedited Bill 21-22 (November 10, 2022) at 2 (stating "[e]xpedited Bill 21-22 would prevent an individual from possessing a firearm within 100 yards of a place of public assembly even when the individual has a wear-and-carry permit from the State of Maryland"). Importantly, that restriction has been the law in Montgomery County *since* 2022.

On July 27, 2026, the County enacted Expedited Bill 23-26—the Bill that the United States challenges in the above-captioned litigation. *See* Ex. 9, 2026 Laws Montgomery Cnty. Ch. 18 (Bill 23-26) ("Bill 23-26E" or the "Bill"). By no means a "newly enacted law" (Mem. at 14), Bill 23-26E further narrows the County's firearm prohibitions to ensure compliance with the current landscape of federal and state law. Section 57-11—the only section that the United States challenges in its Complaint and Motion—reads in pertinent part as follows:

> **57-11. Firearms in or near places of public assembly.**
>
> (a) In or within 100 yards of a place of public assembly, a person must not:
>
> (1) sell, transfer, possess, or transport a ghost gun, undetectable gun, handgun, rifle, shotgun, or ammunition or major component for these firearms; or
>
> (2) sell, transfer, possess, or transport a firearm created through a 3D printing process.

---

[4] *See also* Ex. 6, Fredrick Kunkle, *Supreme Court ruling sets off rush for concealed gun permits in Maryland,* The Washington Post (July 25, 2022) [https://www.washingtonpost.com/dc-md-va/2022/07/15/concealed-carry-maryland-guns-hogan/](https://www.washingtonpost.com/dc-md-va/2022/07/15/concealed-carry-maryland-guns-hogan/).

> (b) This section does not: …
>
> (2) apply to a law enforcement officer, or a security guard licensed to carry the firearm; … or
>
> (6) apply to a firearm that is carried or transported in a motor vehicle if the firearm is:
>
> (A) locked in a container; or
>
> (B) a handgun worn, carried, or transported in compliance with any limitations imposed under Section 5-307 of the Public Safety Article of the Maryland Code, as amended, by a person to whom a permit to wear, carry, or transport the handgun has been issued under the Public Safety Article of the Maryland Code, as amended.

Ex. 9, Bill 23-26E at 5-6. Bill 23-26E further reduced the places of public assembly to which Section 57-11(a) applies, to state:

> **57-1. Definitions.**
>
> In this Chapter, the following words and phrases have the following meanings:
>
> * * *
>
> *Place of public assembly*: A "place of public assembly" is:
>
> (1) a publicly or privately owned:
>
> (A) park;
>
> (B) place of worship;
>
> (C) school;
>
> (D) library;
>
> (E) recreational facility; or
>
> (F) multipurpose exhibition facility, such as a fairgrounds or conference center;
>
> (2) government building open to the public for the business of government or community use;
>
> (3) polling place;
>
> (4) courthouse; or

> (5) legislative assembly.
>
> A "place of public assembly" includes all property associated with the place, such as a parking lot or grounds of a building.

*Id*. at 2-3. Finally, Section 3 of Bill 23-26E states, "If any provision of this Act, or any provision of Chapter 57 is found to be invalid by the final judgment of a court of competent jurisdiction, the remaining provisions must be deemed severable and must continue in full force and effect." *Id.* at 8.

Seeking to capitalize on the fact that a new bill was enacted while ignoring entirely the fact that the bill narrowed, rather than expanded the restrictions that had been on the books for years, this "emergency" litigation followed.

### B. This Court's Denial Of Injunctive Relief In Related Case, Maryland Shall Issue, Inc. v. Montgomery County, Maryland, Civil Action No. 8:21-1736-TDC.

In 2021, Maryland Shall Issue, Inc. ("MSI"), along with other plaintiffs (collectively, the "MSI Plaintiffs"), filed a lawsuit against Montgomery County in which they challenged certain County restrictions in Bill 4-21 (the "MSI Litigation"). Case No. 8:21-1736-TDC, ECF No. 7. On July 27, 2026, MSI joined with a new set of individual plaintiffs (the "MSI/Barreto Plaintiffs") to file *Barreto, et al. v. Montgomery County, Maryland*, Case No. 8:26-cv-02912-DKC. The MSI Plaintiffs subsequently filed a First Amended Complaint, followed by a Second Amended Complaint. Case No. 8:21-1736-TDC, ECF No. 49. While Counts I, II, and III of the Second Amended Complaint presented state law claims that were remanded to the Circuit Court for Montgomery County, Maryland (*see* Case No. 8:21-1736-TDC, ECF No. 77), this Court retained jurisdiction of Counts IV through VIII. Pertinent here, those counts challenged certain components of Bill 21-22E, including Section 57-1's definition of "place of public assembly" and Section 57-11 under the Due Process Clause of the Fourteenth Amendment (Count IV) and the Second Amendment (Count VII). Case No. 8:21-1736-TDC, ECF No. 49.

On December 6, 2022, the MSI Plaintiffs filed their Emergency Motion for a Temporary Restraining Order and Emergency Motion for a Preliminary Injunction, seeking to enjoin enforcement of Section 57-11(a). Case No. 8:21-1736-TDC, ECF No. 54. This Court issued a Memorandum Opinion 7 months later—***and more than three years ago***—on July 6, 2023. *Maryland Shall Issue, Inc. v. Montgomery County, Maryland*, 680 F. Supp. 3d 567 (D. Md. 2023). Stating that "the Court finds that [the MSI] Plaintiffs have not established a likelihood of success on the merits of the claims at issue on the Motion," this Court denied the Motion. *Id*. at 593. The United States attempts to minimize this Court's thorough and well-reasoned Memorandum Opinion—which examined the exact same sensitive places at issue in this case—as "not binding" and "wrongly decided." Compl., ECF No. 1, at 8, n 1.

In their Civil Cover Sheet filed in Case No. 8:26-cv-02912-DKC, the MSI/Barreto Plaintiffs identified the MSI Litigation as a related case, described in this Court's Local Rules as follows: "If counsel for a plaintiff in a civil action believes that the action being filed and one (1) or more other civil actions or proceedings previously decided or pending in this Court (1) arise from the same or identical transactions, happenings, or events; (2) involve the identical parties or property; (3) involve the same patent or trademark; or (4) for any other reason would entail substantial duplication of labor if heard by different judges, counsel shall indicate that fact by designating the case as a "related case" on the civil cover sheet." Local Rule 103.1.b). While the United States in this case identified the *Barreto* case as a related case, it tellingly and undoubtedly knowingly chose to ignore reference to the MSI Litigation, despite the admonition in the Local Rules.

## III. APPLICABLE LEGAL STANDARDS

### A. Motion To Dismiss For Lack Of Subject Matter Jurisdiction And Failure To State A Claim

"When a Rule 12(b)(1) motion challenge is raised to the factual basis for subject matter jurisdiction, the burden of proving subject matter jurisdiction is on the plaintiff." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991); *U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009)). "'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). It is insufficient that the alleged facts create "the mere possibility of misconduct." *Id.* at 679. "Legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts for Rule 12(b)(6) purposes." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (citing *Iqbal*, 556 U.S. at 677).

### B. Motion For Preliminary Injunction

A preliminary injunction is an "extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted), which "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). Because such relief "requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way," "[t]he danger of a mistake in this setting is substantial." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994) (internal quotation marks omitted).

To obtain injunctive relief, the United States must establish that it "is likely to succeed on the merits, [is] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Maages Auditorium v. Prince George's Cnty., Md.*, 4 F. Supp. 3d 752, 760 (D. Md. 2014), *aff'd sub nom. Maages Auditorium v. Prince George's Cnty., Maryland*, 681 Fed. Appx. 256 (4th Cir. 2017). As the test is conjunctive, failure to establish any single factor is fatal to the Motion. "[A]ll four requirements must be satisfied to obtain the extraordinary remedy of a preliminary injunction." *JAK Productions, Inc. v. Bayer*, 616 Fed. Appx. 94, 95 (4th Cir. 2015) (internal citations omitted).

## IV. ARGUMENT

### A. The Complaint Should Be Dismissed With Prejudice Because The United States Lacks Standing And Has Failed To State A Claim Upon Which Relief Can Be Granted.

The United States alleges that "[n]umerous provisions of [Montgomery County] Bill 23-26 violate the Second Amendment." Compl., ECF No. 1 at ¶ 3. The Government's challenge is a facial challenge on the language of the Bill itself, and makes no suggestion of any misconduct—or any conduct whatsoever—by any law enforcement officers. The United States seeks to gloss over that fatal flaw in its theory with the glib suggestion that the Bill itself will cause County law enforcement officials to violate people's rights, but that syllogism simply doesn't work. Because the United States is not challenging a "pattern or practice of conduct by law enforcement officers . . . that deprives persons" of a federal right, 34 U.S.C. § 12601(a), its claim is not cognizable under Section 12601, and the Complaint should be dismissed in its entirety with prejudice.

#### 1. The United States Lacks Standing.

The United States has not demonstrated that the injury it alleges here—*i.e.*, a purported "pattern or practice of conduct" by any of Defendants in this case that deprives people "of the right to keep and bear arms"—is redressable by this Court, and therefore has failed to establish Article

III standing. Its Complaint should be dismissed for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

Article III of the United States Constitution limits federal courts' jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. One of those limits is that "the plaintiff must have standing to sue." *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 110 (2025). The standing doctrine ensures that "[f]ederal courts do not possess a roving commission to publicly opine on every legal question" or to "exercise general legal oversight" of other branches of government. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021). To establish standing at the pleading stage, the plaintiff must "clearly … allege facts demonstrating" injury in fact, causation, and redressability. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted).

Presumably to get around the fact that the United States alleges no injury here, it alleges that this Court "has authority to grant the remedies Plaintiff seeks pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 34 U.S.C. § 12601[,] [a]nd the United States is authorized to initiate this action against the Defendants under Section 12601." Compl., ECF No. 1 at ¶ 10. The plain language of that statute, as well as the purpose for its codification—to prevent patterns and practices of misconduct by police, not to coerce rigid adherence to a federal point of view about specific local laws—demonstrates otherwise.

34 U.S.C. § 12601 was enacted in 1991, in the aftermath of the beating of Rodney King by Los Angeles police. *See United States v. California*, No. 8:26-cv-01697, 2026 WL 2004372, at *4 (C.D. Cal. July 9, 2026); Ex. 10, U.S. Dep't of Just., Taking Stock: Report from the 2010 Roundtable on the State and Local Law Enforcement Police Pattern or Practice Program (42 USC § 14141) 1-2 (Sept. 2011) ("Roundtable Report"), https://www.ojp.gov/pdffiles1/nij/234458.pdf. The brutal incident and subsequent national outrage led to a series of congressional hearings on

police misconduct and the introduction of the Police Accountability Act of 1991. *See* H.R. Rep. No. 102-242, pt. 1, at 135-39 (1991); H.R. Rep. No. 102-1085, at 63, 65 (1992).

That act did not ultimately become law, but a modified version was incorporated into the 1994 Crime Bill and eventually codified as Section 12601. *See* Ex. 11, Pub. L. No. 103-322, tit. XII, 108 Stat. at 2071. The stated purpose of the Police Accountability Act was to address a "culture" of "excessive force against the public" in which "officers who choose to be brutal and abusive are left to do so without fear of interference," and pointed to similar incidents in other cities throughout the country resulting in "a significant problem" of excessive force across the country. H.R. Rep. No. 102-242, pt. 1, at 135. The report also described other "pattern[s]" of "police brutality" and "police misconduct," including unconstitutional stops and searches of minorities. *Id*. at 136.

Congress was mindful of the fact that "[h]istorically, day-to-day responsibility for operation of the Nation's criminal justice system has rested with those units of government that are closest to the people." *Id*. at 88. It thus gave assurance that the law would reflect its duty to "respect and promote the fundamental role of the states and local governments" in that area. *Id*. Consistent with our federalist structure, the law would simply "provide[] another tool" to address police misconduct. *Id*. at 138.

With this new tool in place after the enactment of Section 12601, the Department of Justice established standard procedures for addressing police misconduct. *See* Ex. 12, Civ. Rts. Div., U.S. Dep't of Just., The Civil Rights Division's Pattern and Practice Police Reform Work: 1994–Present (2017) ("2017 DOJ Report"). The Special Litigation Section in the Civil Rights Division first conducts a preliminary inquiry into policing practices. *Id*. at 5. If it uncovers evidence of police misconduct, it considers many factors in weighing whether and how to proceed, "including actions

by private litigants." *Id*. at 7-8. Where action under Section 12601 is deemed appropriate, the Division launches a formal investigation. *Id*. at 8. The investigation usually involves a comprehensive analysis of the law enforcement agency in a particular community, including of the agency's written policies, training procedures, data collection, and actual police practice on the ground. *Id*. at 9-12. If the Division finds reasonable cause to believe that a pattern or practice of police misconduct exists, it notifies the jurisdiction with detailed findings. *Id*. at 15-16. It then "negotiates reform agreements resolving those findings," which "are geared toward changing policies, practices, and culture across a law enforcement agency." *Id*. at 1, 20. Only if "an agreement cannot be negotiated" does "the Division … bring a lawsuit to compel needed reforms." *Id*. at 1-2, 18.

As the report explains (and as another court recently recognized, *see California*, 2026 WL 2004372, at *4), these cases have historically "focus[ed] on systemic police misconduct," including "patterns of unlawful use of force; unlawful stops, searches and arrests; and racial discrimination." Ex. 12, 2017 DOJ Report at 1, 3, 6. The goal is "to achieve organizational change within police departments where institutional failures have caused systemic police misconduct." *Id*. at 20. The report's compendium of pattern or practice cases brought between 1994 and 2017 confirms that the Department of Justice has consistently used Section 12601 only to challenge patterns of misconduct by law enforcement. *Id*. at 41-48; *see also* Ex. 10, Roundtable Report at 19-20 (listing settlements and investigations as of July 2010).

That historical pattern of using the Police Accountability Act for its intended purpose of curbing patterns and practices of police misconduct took a sharp turn late last year, when the Civil Rights Division's newly established "Second Amendment Section" started wielding Section 12601 as a cudgel, designed to address local laws that were deemed insufficiently adherent to the Justice

Department's point of view. The Civil Rights Division's head referred to this approach as "revolutionary" and acknowledged that the federal government's new tactic of using this law as a means to try to challenge state and local laws as unconstitutional has "never been done before." *See* The Arena with America First Legal, *Reclaiming Civil Rights with Assistant Attorney General Harmeet Dhillon*, at 28:47-29:15, 33:30-33:34 (YouTube, June 1, 2026), https://www.youtube.com/watch?v=wdzUq0g5MJY.

The instant case is just the latest in a series of attempts by the Department of Justice to retrofit Section 12601 to its political purposes, having nothing to do with the intent or the historical application of the legislation itself. Only one court has ruled in one of these cases to date, and it rejected the Department's request for a TRO, saying that "the use of Section 12601 to facially challenge a state criminal law is, at the very least, a novel approach that deviates from the way the statute has historically been enforced." *California*, 2026 WL 2004372, at *4.

The plain language of the statute makes that clear. Section 12601 allows the Attorney General to sue over a "pattern or practice" of law enforcement officer misconduct. 34 U.S.C. § 12601(a). The United States' attempt to use it to mount a facial attack on democratically enacted local laws as written is unprecedented and beyond Section 12601's text. Not only is the text clear, but every traditional tool of statutory interpretation points toward reading it as every prior administration has done: It authorizes only challenges to specific patterns and practices of law enforcement officer misconduct. It does *not* authorize suits like this one, which try to shoehorn and pervert the very purpose of the law to have this Court find Bill 23-26E unconstitutional.

2. <u>The Complaint Fails To Allege A Pattern Or Practice Of Conduct By Law Enforcement Officers As Required Under Section 12601.</u>

Even assuming a claim brought under this framework is cognizable, the United States has not alleged that any of the Law Enforcement Officers, as defined in the Complaint as the

"Montgomery County LEOs" has taken any enforcement action with respect to Bill 23-26E. The Complaint does not allege any facts plausibly showing the supposed "pattern or practice of conduct by law enforcement officers . . . that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." 34 U.S.C. § 12601(a). The Complaint simply baldly alleges: "When the Montgomery County [law enforcement officers] enforce [Montgomery County Bill 23-26E], they are engaging in a pattern or practice of conduct by law enforcement officers." Compl., ECF No. 1 at ¶ 49. This reasoning, if taken to its logical—or illogical—conclusion, would eviscerate the sovereignty of state and local law enforcement, and make the Justice Department the arbiter of all criminal law enforcement in America. This notion is abhorrent to our system of government and is more of a threat to constitutional rights than any conceivable threat posed by Bill 23-26E.

As noted, the Complaint does not contain a single allegation of actual enforcement of Bill 23-26E, let alone of Sheriff Uy or any deputy sheriffs or any employee of the Montgomery County Police Department engaging in a pattern or practice of such conduct. There is no allegation, no evidence, and not even any proffer regarding specific enforcement practices, or even a suggestion of whether and how Bill 23-26E is being enforced or by whom. The United States instead relies entirely on the general proposition that Montgomery County law enforcement officers, including unidentified Montgomery County police officers and Sheriff Uy and unidentified deputies, are charged with enforcing Montgomery County law.[5] Compl. ¶¶ 45-46. That is plainly insufficient to state a claim. *See Iqbal*, 556 U.S. at 679 ("[W]here the well-pleaded facts do not permit the

[5] In counties such as Montgomery with established police departments, "the functions ordinarily performed by deputy sheriffs as a primary part of their daily activities are dissimilar from those primarily performed by police officers." *See Soper v. Montgomery Cty.*, 449 A.2d 1158, 1162-65 (Md. 1982) ("[I]n Montgomery County deputy sheriffs, as a primary part of their daily activities, do not perform law enforcement duties ordinarily performed by police officers . . . .").

court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown[ ]'—'that the pleader is entitled to relief." (quoting Fed. Rule Civ. Proc. 8(a)(2))).

At the pleading stage, a plaintiff need only allege sufficient "factual matter (taken as true) to suggest" a cognizable cause of action. *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017) (quoting *Twombly*, 550 U.S. at 556). Here, that means facts showing a pattern or practice of enforcement by the law enforcement officers alleged in the Complaint. The Complaint falls well short as it does not allege a single instance of enforcement, let alone "a pattern or practice of conduct by law enforcement officers." 34 U.S.C. § 12601(a).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). There is no factual content in the Complaint from which the Court may reasonably infer any such "misconduct." The Court cannot reasonably infer a "pattern or practice of conduct by law enforcement officials" merely from the existence of Bill 23-26E and the alleged law enforcement officers' authority to enforce it. It does not necessarily follow from the existence of a law that law enforcement officers have a regular or established practice of enforcing that law. In the absence of specific factual allegations of a pattern or practice of enforcement action, or facts from which the Court may reasonably infer such a pattern or practice, the Complaint must be dismissed for failure to state a claim under Section 12601.

3. <u>Neither The Montgomery County, Maryland Police Department Nor The Montgomery County, Maryland Sheriff's Office Is A Legal Entity Subject To Suit.</u>

It is well-settled that "[c]ounty police departments are agents of the State and should not be viewed as separate legal entities." *See Hines v. French*, 852 A.2d 1047, 1068 (Md. App. 2004). Because a police department is not a legal entity, it "lacks the capacity to be sued." *Upman v.*

*Howard County Police Dep't*, RDB-09-1547, 2010 WL 1007844, at *2 (D. Md. Mar. 17, 2010); *see also id.* ("Maryland law is not unique as federal courts have traditionally recognized that individual government departments lack the capacity to be sued."). This is a separate and independent basis on which the Police Department must be dismissed. *See Hines*, 852 A.2d at 1068 (naming a police department as a party defendant is "improper and unnecessary"); *see also Rhodes v. Montgomery Cnty. Dep't of Corrs. & Rehab.*, No. 12-03172, 2013 WL 791208, at *6 (D. Md. Mar. 1, 2013) (citations omitted) (dismissing Montgomery County Police Department and permitting amended complaint naming Montgomery County, Maryland as appropriate defendant).

Similarly, "Maryland courts have long recognized that a county sheriff's office is not a legal entity capable of being sued."[6] *Coster v. Maryland*, No. GLR-21-65, 2021 WL 5605027, at *11 (D. Md. Nov. 30, 2021) (collecting cases); *see also Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 874 (4th Cir. 1989) (affirming dismissal of claim against the "Office of Sheriff" because it is not a cognizable legal entity); *Hodge v. Stephens*, No. 12–cv–01988–AW, 2013 WL 398870 (D. Md. Jan. 31, 2013), *aff'd*, 533 F. App'x 344 (4th Cir. 2013) (dismissing claims against the Calvert County Sheriff's Office because it is not an entity subject to suit); *Jarvis v. Montgomery Cty.*, No. 11-cv-00654-AW, 2011 WL 5547979, at *3 (D. Md. Nov. 14, 2011) ("Under [Fed. R. Civ. P.] 17(b), a plaintiff may bring suit against any entity capable of being sued. Under Maryland law, the Sheriff's Office is not such an entity.").

### B. The United States Cannot Meet Its Burden To Demonstrate Entitlement To Injunctive Relief.

As an initial matter, and as more fully explained in Section IV.A.1. above, which argument is incorporated here by this express reference, the United States has no standing to bring this action

---

[6] Just prior to the filing of the Defendants' motion to dismiss, the United States voluntarily dismissed the Montgomery County, Maryland Sheriff's Office. ECF No. 23.

and therefore, this Court lacks subject matter jurisdiction even to consider the Motion for Preliminary Injunction. Even if the United States somehow could be found to have standing, it cannot establish any one of the four prerequisite factors for injunctive relief on the single claim it alleges for purported violation of 34 U.S.C. § 12601(a).

1. <u>The United States *Cannot* Demonstrate a Substantial Likelihood of Prevailing on the Merits.</u>

a. Section 12601 Does Not Authorize Facial Challenges To State Laws.

By its terms, Section 12601 permits the United States to challenge the lawfulness of systemic, rights-depriving "conduct by law enforcement officers," not the facial constitutionality of state laws. The United States' contrary interpretation cannot be squared with Section 12601's text, history, enforcement practice, or separation of powers and federalism principles. Interpreting Section 12601 to authorize facial challenges to state laws fails to make sense of the words Congress chose. Section 12601 authorizes suits over rights-depriving "conduct by law enforcement officers," yet officer conduct is irrelevant in a facial challenge. In resolving facial challenges, courts consider "only the text of the statute," *Nguyen v. Bonta*, 140 F.4th 1237, 1240 (9th Cir. 2025), and to succeed, the plaintiff must show that the law is "unconstitutional in all its applications." *United States v. Martinez*, 169 F.4th 1147, 1153 (9th Cir. 2026). Actual enforcement practices make no difference. The suggestion defies logic that Congress would have drafted a statute authorizing suits over rights-depriving "pattern[s] or practice[s] of conduct by law enforcement officers," with the notion to have that statute authorize suits in which the law enforcement practices themselves are entirely irrelevant. Moreover, as set forth above, the federalism implications would be astonishing. Authorizing the U.S. Attorney General to sue individual states, counties and local law enforcement authorities for all alleged violations of

individuals' rights would be a sweeping grant of federal authority that would disrupt the constitutional federal-state relationship.

b. Bill 23-26E Does Not Implicate the Second Amendment.

In 2008, the United States Supreme Court conducted its "first in-depth examination" of the Second Amendment in *District of Columbia v. Heller* and held that a ban against handgun possession in the home violates the Second Amendment. 554 U.S. 570, 635 (2008). Two years later, in *McDonald v. City of Chicago*, the Court determined that the Second Amendment applies to the States via the Fourteenth Amendment. 561 U.S. 742, 750 (2010). Over a decade after *McDonald*, the Court decided *Bruen*, holding that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." 597 U.S. at 10.

All three cases recognize, however, that "the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. *See also id*. at 626 (the right to bear arms for self-defense is not a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose"); *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring) ("[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations" (quoting *Heller*, 554 U.S. at 636)); *McDonald*, 561 U.S. at 786 (noting that it is "important to keep in mind" that *Heller* did not cast doubt on certain "longstanding regulatory measures" in connection with firearms).

The most well-settled permissive regulations are those involving sensitive places—the only provision of the County Code that is challenged in the United States' lawsuit. *See* Compl., ECF No. 1 at ¶ 20 ("This is a 'sensitive places' case."). Starting with *Heller*, the Supreme Court clarified that "nothing in our opinion should be taken to cast doubt on…laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Heller*, 554 U.S. at 626. In *Bruen*, the Court considered *Heller's* "discussion of [those] 'longstanding' 'laws'" and noted

"no disputes regarding the lawfulness of such prohibitions." 597 U.S. at 30. The *Bruen* Court declined "to comprehensively define 'sensitive places,'" but rather invited courts to "use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." 597 U.S. at 30. *See also United States v. Rahimi*, 602 U.S. 680, 691-92 (2024) ("By that same logic, the Second Amendment permits more than just those regulations identical to those that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers.").

As stated above, the United States altogether fails to plead any *fact* in its Complaint to support the conclusory allegation of some "pattern or practice of law enforcement [officials] that deprives individuals of their federal civil rights protected under the Second Amendment to the United States Constitution." Compl., ECF No. 1, ¶ 49. Similarly, the United States makes no attempt in its Motion to demonstrate a likelihood of success in proving that alleged pattern or practice of enforcement. While the Complaint alleges that the County's ban of firearms in parks, libraries, recreational facilities, and multipurpose exhibition facilities comprises "Unlawful Prohibitions" (Compl., ECF No. 1 at ¶ 24), the Motion, at *best*, limits the inquiry before this Court at this juncture to houses of worship. Even in that limited inquiry, the Motion falls woefully short: the United States musters eleven form Declarations—identical in content except for the name of the affiant—of Montgomery County residents who purportedly "regularly attend religious services" and "would like the opportunity to lawfully carry a firearm for defense of [him/her]self and others while attending worship, subject to [his/her] compliance with all applicable laws." *See* ECF Nos. 3-2 – 3-12.

Those redundant form Declarations do not even disclose the location—whether in Montgomery County or elsewhere—of any religious services that they attend, or whether those religious services "are actually open to members of the public." *Maryland Shall Issue*, 680 F. Supp. 3d at 576. On the plain language of the Declarations, these affiants could be attending religious services via Zoom. Not a single Declaration states that the affiant was prosecuted for actually carrying a firearm into any place of worship. Nor does the United States provide any other "examples of prosecutions … for possessing a firearm in the scenarios" the United States references in its Complaint or Motion, "such as a prosecution for possessing a firearm on a public street or area that happens to be within 100 yards of a place of public assembly, or for carrying a firearm at a place of worship." *Maryland Shall Issue*, 680 F. Supp. 3d at 594. While this Court noted a similar failure of the MSI Plaintiffs in the context of their burden to demonstrate imminent harm, that failure is equally fatal to the Motion here. There is simply nothing from which this Court may glean a "likelihood"—let alone a "pattern and practice"—of "arrest and conviction for a felony firearm offense at all. *Id*. This should end this Court's inquiry, because "all four requirements [of a preliminary injunction] must be satisfied to obtain [its] extraordinary relief." *JAK Productions*, 616 Fed. Appx. at 95.

Even assuming, *arguendo*, this Court finds any basis to examine the likelihood, *vel non*, of the United States' success on the merits of proving a deprivation of rights, the United States fails there, too. Especially where "a challenge to a particular location category requires a different legal analysis" such that this Court "construes each such challenge to be a separate claim for which standing must be established" (*Maryland Shall Issue*, 680 F. Supp. 3d at 578), the United States' passing reference in the Motion to parks, libraries, recreational facilities, and multipurpose exhibition facilities (Mem. at 12-13) is insufficient to carry its burden to demonstrate entitlement

to injunctive relief. The United States does not proffer any declarations (not even the flawed versions that it attaches relating to places of worship) to suggest that there is any pattern or practice of enforcement, or any enforcement at all for that matter, of the County's gun restrictions at these other sensitive places. In any event, this Court engaged in a thorough, well-reasoned analysis of the ample historical analogues presented by the County in the MSI Litigation to each of the sensitive places that remain in Bill 23-26E. *See Maryland Shall Issue*, 680 F. Supp. 3d at 585-88 (parks, recreational facilities, and multipurpose exhibition facilities), 588 (libraries), and 589-90 (100-yard buffer zones). This Court's conclusion was that the MSI Plaintiffs do not have a likelihood of success on the merits of their Second Amendment challenge to *any* sensitive place in Bill 23-26E. That ruling is equally applicable here. Simply because the United States announces its view that this Court "wrongly decided" (Compl. ECF No. 1 at 8, n. 1) those issues, does not and cannot overturn this Court's reasoned and thorough analysis.

The United States is flatly wrong that "[t]he nation has no 'tradition of banning firearms in places of worship.'" Mem. at 12 (citing *Wolford v. Lopez*, 116 F.4th 959, 996 (9th Cir. 2024)). This bald contention would have this Court ignore the squarely relevant decision of *this Court* in the MSI Litigation, which the United States simply pretends does not exist. In finding that the MSI Plaintiffs "are not likely to succeed on the merits of their Second Amendment claim relating to the carrying of firearms in places of worship," this Court determined that the County's cited "historical statutes and ordinances demonstrate that there is 'historical precedent' from the time period of the ratification of the Fourteenth Amendment that 'evinces a comparable tradition of regulation' of firearms at places of worship." *Maryland Shall Issue*, 680 F. Supp. 3d at 585. This Court properly based its ruling on the following analogues, which apply here with equal force, because Bill 23-

26E includes the same verbatim prohibition in the same "places of worship" that Bill 21-22E presented:

- Georgia in 1870 and 1882 prohibited the carrying of a pistol or revolver, or any kind of deadly weapon, to any place of public worship, "or any other public gathering" in the state.[7] Georgia's 1882 prohibition did not apply to law enforcement. *Id*. In 1870, 1871, and 1879, Texas prohibited any person from going into any church or religious assembly with a gun, and its laws in the latter two years also prohibited guns at "any other public assembly."[8] The Texas laws did not apply to law enforcement. *See id.*
- Missouri in 1875, 1879, and 1883 prohibited firearms in any church or place where people assembled for religious worship.[9] In the 1890s, two localities in Missouri prohibited weapons at religious assemblies. Columbia, Missouri, prohibited the carry of dangerous weapons "into any church, or place where people have assembled for religious worship" in 1890.[10] In 1894, Huntsville, Missouri, prohibited the carry of a deadly or dangerous

[7] *See* Ex. 13, An Act to Preserve the Peace and Harmony of the People of this State, and for Other Purposes, Penal Code, Title 16, No. 285, *Acts and Resolutions of the General Assembly of the State of Georgia* 421 (1870); Ex. 14, Georgia Code, Part IV, Title I, Division IX, § 4528, *The Code of the State of Georgia* (1882).

[8] *See* Ex. 15, An Act Regulating the Right to Keep and Bear Arms, Ch. 46, § 1, *General Laws of the Twelfth Legislature, of the State of Texas* 63 (1870); Ex. 16, An Act Regulating the Right to Keep and Bear Arms, Art. 6511 (1870) and An Act to Regulate the Keeping and Bearing of Deadly Weapons, Crim. Code Art. 6514(1871), *A Digest of the Laws of Texas* 1322, 1323 (1875); Ex. 17, Texas Code, Tit. 9, Ch. 4, Art. 320, Carrying Arms in Church or Other Assembly, *The Revised Statutes of Texas* 43 (1879).

[9] Ex. 18, An Act to Prevent the Carrying of Weapons in Public Assemblies of the People, § 1, *Laws of Missouri, General and Local Laws Passed at the Regular Session of the Twenty-Eighth General Assembly* 50-51 (1875); Ex. 19, Revised Statutes of the State of Missouri (1879); Ex. 20, An Act to Amend Section 1274, Article 2, Chapter 24 of the Revised Statutes of Missouri, Entitled "Of Crimes and Criminal Procedure," § 1, *Laws of Missouri Passed at the Session of the Thirty-Second General Assembly* 76 (1883).

[10] *See* Ex. 21, Chapter XVII: Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, Etc., May 22, 1890, *General Ordinances of the Town of Columbia, in Boone County, Mo.* 34, 35 (1890).

weapon in "any church or place where people have assembled for religious worship."[11] This prohibition did not apply to police officers.[12]

- Virginia in 1877 prohibited pistols or other dangerous weapons in "any place of worship while a meeting for religious purposes is being held at such a place, or without good or sufficient cause therefor."[13]
- Arizona, while still a territory in 1889 and 1901, prohibited the carrying a pistol or other firearm in any church or religious assembly.[14] This did not apply to law enforcement. *See id.* When it was still a territory, Oklahoma in 1890 and 1893 prohibited the carry of firearms into "any church or religious assembly."[15]

These historical precursors match the County's prohibition of guns in places of worship. Indeed, like most of these laws, the County's law exempts law enforcement officers or security guards.

In addition, several courts in the 1870s viewed churches or places of worship as no place for firearms. *See Hill v. State*, 53 Ga. 472, 475 (Ga. 1874) (carrying arms at places of worship "[i]s a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee"); *English v. State*, 35 Tex. 473, 478-79 (Tex. 1872) (finding it

---

[11]Ex. 22, Huntsville, Missouri, Ordinance in Relation to Carrying Deadly Weapons, § 1 *The Revised Ordinances of the City of Huntsville, Missouri of 1894* 58 (1894).

[12] *See id.* § 2.

[13] Ex. 23, Acts of Virginia Assembly, Ch. 7, of Offences [sic] Against Morality and Decency –Protection of Religious Meetings § 21, *Acts and Joint Resolutions of the General Assembly of the State of Virginia* 305 (1878).

[14] Ex. 24, An Act Defining and Punishing Certain Offenses Against Public Peace, § 3, *Session Laws of the Fifteenth Legislative Assembly of the Territory of Arizona* 17 (1889); Ex. 25, Arizona Territory Statutes, Crimes and Punishments § 387, *The Revised Statutes of the Arizona Territory* 1252 (1901).

[15] *See* Ex. 26, Territory of Oklahoma Statutes, Crimes and Punishment, Art. 47, § 7, *The Statutes of Oklahoma 1890, Laws Passed by the First Legislative Assembly of the Territory* 496 (1890); Ex. 27, Oklahoma Territory Statutes, Art. 45, § 7, *Statutes of Territory of Oklahoma, 1893* 504 (1893).

"[l]ittle short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance, into a church…"); *Andrews v. State*, 50 Tenn. 165, 182 (Tenn. 1871) (observing a "[m]an may well be prohibited from carrying his arms to church, or other public assemblage, as the carrying them to such places is not an appropriate use of them").

The United States provides no support for its suggestion that "early American laws affirmatively required the faithful to bring arms to their places of worship." Mem. at 11. To the extent that the United States is referring to the laws cited by the Ninth Circuit in *Wolford*, the Ninth Circuit itself rejected that comparison, stating, "those laws clearly addressed a different perceived societal problem—protection of the colony from raids by Native Americans and from slave revolts." 116 F.4th 959, 997 (9th Cir. 2024). Far from attempting to protect any deprivation of rights, those regulations "are rooted in racism not the Second Amendment." *Goldstein v. Hochul*, 680 F. Supp. 3d 370, 396 (S.D.N.Y. 2023).

No hypothetical experience of any "hypothetical law-abiding young woman" (Mem. at 10) can supply facts that would supply standing, or satisfy the United States' substantial burden to demonstrate the likelihood of success on the merits that there is any improper enforcement in buffer zones, let alone an improper pattern and practice of enforcement there. Indeed, none of the Affiants who presented Declarations even mention buffer zones. Regardless, similar to its findings regarding places of worship, this Court credited the County's citation of "numerous examples of laws prohibiting firearms in buffer zones of a certain distance around a 'sensitive place' or other location at which the government could prohibit the carrying of firearms" to decide that the MSI Plaintiffs "are unlikely to succeed on the merits of their challenge to Section 57-11's 100-yard

buffer zones." *Maryland Shall Issue*, 680 F. Supp. 3d at 590. That buffer zone was untouched by the new Bill.

Having apparently willed this Court's well-reasoned decision out of existence, the United States then ignores the law of this Circuit to advance non-binding approaches of other Circuits that it prefers. The United States cites to the Ninth Circuit's rejection of certain historical analogues as purportedly demonstrating "no 'tradition of banning firearms in places of worship'" (*see* Mem. at 12 (citing *Wolford*, 116 F.4th at 996; *see also id.* at 997), because those analogues prohibited the carry of firearms in places of worship after the ratification of the Fourteenth Amendment. But, the Ninth Circuit recognized that strict uniformity among the Circuits is not the rule, finding "District courts have divided on this question" and even citing this Court's Memorandum Opinion in the MSI Litigation—which tellingly the United States completely ignores in its Motion—as one District Court that has "reach[ed] the opposite conclusion." *Id.* On that point, this Court concluded that "historical sources from the time period of the ratification of the Fourteenth Amendment"—such as those discussed above—"are equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to the states by the Fourteenth Amendment." *Maryland Shall Issue*, 680 F. Supp. 3d at 582.

This Court's approach is, in fact, the approach mandated by the Fourth Circuit in *Kipke v. Moore*, 165 F.4th 194 (4th Cir. 2026), *petition for cert. filed* (U.S. Apr. 15, 2026) (No. 25-1324). In *Kipke*, the Fourth Circuit continued its approach developed in *Bianchi v. Brown*, 111 F.4th 438, 472 (4th Cir. 2024), and concluded that "the sources we look to at *Bruen* step two [of finding historical analogues] can come throughout American history." 165 F.4th at 207. In other words, this Circuit expressly has rejected the approach taken by the selective and cherry-picked authority from other Circuits upon which the United States misplaces its reliance.

The United States's selective citation of only those portions of cases that it likes continues with its suggestion that "Bill 23-26 effectively abrogates the right to carry." Mem. at 6. The Ninth Circuit flatly rejected this same argument in *Wolford*—again, a case upon which the United States relies. The Ninth Circuit reasoned, in pertinent part, that "the precise reach of the law is uncertain" because the plaintiffs there—like the United States here—only raised "facial challenges to most aspects of the law at this preliminary stage." *Wolford*, 116 F.4th at 984, n. 4. Indeed, even if the United States's statistics—which the United States apparently borrowed from the MSI/Barreto Plaintiffs (Mem. at 6, n. 3 and 7-8)—are accurate, a person may still carry a handgun in 74% of the County. That is hardly an impact that, as the United States posits, is "so extensive" that it makes "exercising the constitutional right to bear arms impracticable, if not impossible." Mem. at 9.

2. The United States Will Not Suffer Irreparable Harm If The Court Does Not Issue A Preliminary Injunction.

The United States fails to make a clear showing that "irreparable injury is **likely** in the absence of an injunction." *Winter,* 555 U.S. at 22 (2008) (emphasis in original). The harm to be suffered may not be "remote [o]r speculative, but actual and imminent." *Mountain Valley Pipeline, LLC v. 6.56 Acres*, 915 F.3d 197, 216 (4th Cir. 2019) (citation and quotations omitted). Additionally, harm is irreparable when it "cannot be fully rectified by the final judgment after trial." *Id.*

In the first instance, there is no conceivable injury suffered by the United States here, and the cases it cites do not support any claim to the contrary. *Vermont Agency of Nat. Res. v. United States ex re. Stevens* addressed a claim where the United States was induced into "disburs[ing] more grant money than petitioner was entitled to receive" and therefore suffered an injury for an alleged violation of the False Claims Act. 529 U.S. 765, 770 (2000). *Pasadena City Bd. Of Educ. v. Spangler*, only addresses Article III standing for the United States to intervene in an action

"seeking relief from the denial of equal protection of the laws under the fourteenth amendment to the Constitution on account of race, color, religion, sex or national origin" when that intervention expressly is permitted by statute. 427 U.S. 424, 430-31 (1976). Mere standing—in another case under a different statute—does not come close to demonstrating the *likelihood* of irreparable harm in this case.

As this Court explained, "[t]o establish irreparable harm, a plaintiff 'must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Id*. at 593 (citations omitted). In a case such as this, that element requires "examples of prosecutions … for possessing a firearm in the scenarios" the United States references in its Complaint or Motion, "such as a prosecution for possessing a firearm on a public street or area that happens to be within 100 yards of a place of public assembly, or for carrying a firearm at a place of worship." *Maryland Shall Issue*, 680 F. Supp. 3d at 594. No such showing is made here at all.

Instead, the *only* irreparable harm that the United States proffers is an alleged deprivation of a constitutional right. *See* Mem. at 16. However, "the likelihood of irreparable harm on this basis is dependent on the likelihood of success on the merits of the claim." *Maryland Shall Issue*, 680 F. Supp. 3d at 593. Because the United States has not shown a likelihood of success on the merits of its claim, its Motion does not support irreparable harm here.

Moreover, these same prohibitions have existed in County law, in substantially the same form, *since 1997*. *See* Section II.A. above. It is the United States' position that it has had authority to bring a 12601 challenge since 1991. Yet, without any explanation whatsoever for having waited, in the almost thirty years that it claims to have had that authority, it never challenged the County's law—until now. That delay alone is sufficient support to find a lack of irreparable harm—and

therefore to deny the Motion altogether. *See Roswell v. Mayor & City Council of Baltimore*, 671 F. Supp. 3d 607, 618 (D. Md. 2023).

3. The Balance Of The Equities And The Public Interest Weigh In Favor Of Denying The United States' Request For A Preliminary Injunction.

When injunctive relief is sought against the government, and "the government's interest is the public's interest," the third and fourth elements necessary for an injunction—the balance of the equities and the public interest—"merge." *See Ass'n of Cmty. Cancer Cntrs. v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020) (citing *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) and *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

"'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (internal citation omitted). That notion applies equally to the County here. Moreover, a government's "[i]nability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). This is especially true when the law involves public safety. *See Maryland*, 567 U.S. at 1303.

Courts historically recognize that public safety—albeit in a means-end scrutiny context—is a compelling governmental interest. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 750 (1987) ("the Government's general interest in preventing crime is compelling"); *Schall v. Martin*, 467 U.S. 253, 264 (1984) ("[t]he legitimate and compelling state interest in protecting the community from crime cannot be doubted" (citation and quotations omitted)). The Founders reserved to the states, and by extension local governments such as the County, police powers to protect the public and to prevent violence. *See United States v. Morrison*, 529 U.S. 598, 618 (2000) (stating there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims").

Staying enforcement of Bill 23-26E will undermine the strong interest that the County has in the safety of the public, and in preventing gun violence in areas where people, especially vulnerable populations, congregate.

Finally, as this Court previously has explained, "there is a public interest in not prematurely enjoining Section 57-11 before a final determination on constitutionality is made." *Maryland Shall Issue*, 680 F. Supp. 3d at 594. This fact applies with equal force to Bill 23-26E, and weighs especially in favor of the County, when the United States here has asserted no previous challenge to County law that—for purposes of the alleged application—has been on the books for decades. *See Benisek v. Lamone*, 585 U.S. 155, 160 (2018) (per curiam) ("In considering the balance of equities among the parties, we think that plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request."). Moreover, "'hasty consideration of the complex issue[s] raised by this lawsuit, including whether 34 U.S.C. § 12601 is a proper vehicle for this action'" weighs against entry of a preliminary injunction, even to the extent that challenge survives the County's dispositive jurisdictional challenge. *See California*, 2026 WL 2004372, at *5.

## V. CONCLUSION

The United States has made a tactical decision to flip Section 12601 on its head, and to use it as a means to strip local legislative bodies of their province, by suing local law enforcement authorities to prevent enforcement of local laws. Montgomery County, Maryland is the latest stop in its sweep across the nation. This attempted use of this specifically intentioned legislation has nothing to do with the purpose or history of the statute, and finds no support either in its letter or its spirit. There is no basis for its use here, and as a matter of settled jurisdictional law, the United States' lawsuit should be dismissed. Further, to the extent it could have established jurisdiction,

this Court has already looked at and determined the underlying flaw in the suggestion that there is any likelihood of a finding that Bill 23-26E violates the Second Amendment. Finally, the United States' challenge here brings nothing new to this Court that would suggest a finding of the need for emergency action, when this Court has already determined otherwise. It is merely another bite at the same apple that already has been bitten, without any new fact or new reason to suggest a different outcome this time.

Respectfully submitted,

JOHN P. MARKOVS
COUNTY ATTORNEY

By: /s/ Jeffrey M. Schwaber

Jeffrey M. Schwaber (Bar ID #06095)
jschwaber@steinsperling.com
(301) 354-8110 (facsimile)
Deanna L. Peters (Bar ID #15674)
dpeters@steinsperling.com
(301) 354-8131 (facsimile)
STEIN SPERLING BENNETT
DE JONG DRISCOLL PC
1101 Wootton Parkway, Suite 700
Rockville, Maryland 20852
(301) 340-2020

/s/ Erin J. Ashbarry

Erin J. Ashbarry (Bar ID #26298)
Chief, Division of Government Operations
erin.ashbarry@montgomerycountymd.gov
Office of the County Attorney
101 Monroe Street, 3rd Floor
Rockville, Maryland 20850
(240) 777-6700
(240) 777-6705 (facsimile)

*Attorneys for Defendants, Montgomery County, Maryland, and Montgomery County, Maryland Police Department*

and

ANTHONY G. BROWN
ATTORNEY GENERAL OF MARYLAND

/s/ Emily Green Hull
Emily Green Hull (Bar ID #31074)
egreenhull@oag.maryland.gov
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-7010
(410) 576-6955 (facsimile)

*Attorneys for Defendants Sheriff Maxwell C. Uy and the Montgomery County, Maryland Sheriff's Office*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 27th day of August, 2026, a copy of the foregoing was sent to all counsel of record via CM/ECF.

/s/ Jeff M. Schwaber
Jeffrey M. Schwaber (Bar ID #06095)