**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

UNITED STATES OF AMERICA,

Plaintiff,

v.

MONTGOMERY COUNTY, MARYLAND; MONTGOMERY COUNTY, MARYLAND POLICE DEPARTMENT; and MAXWELL C. UY, in his official capacity as Sheriff of Montgomery County, Maryland,

Defendants.

Case No. 8:26-cv-3025-TDC

# PLAINTIFF'S COMBINED

# RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

# AND

# REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

TABLE OF CONTENTS


INTRODUCTION ........................................................................................................ 1

RESPONSE TO MOTION TO DISMISS FOR LACK OF JURISDICTION .............................. 2

RESPONSE TO MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM........................ 4

I. Rule 12(b)(6) Motion Standard of Review. ........................................................... 4

II. Plaintiff Has Plausibly Pleaded a Claim under Section 12601. .......................................... 5

A. A Section 12601 Claim Has Three Elements. ............................................................ 5

B. Element One: Section 12601 Applies to Defendants. .................................................... 6

C. Element Two: A Pattern or Practice of Law Enforcement Conduct Exists. .................... 6

D. Element Three: Plaintiffs Have Plausibly Alleged That Defendants' Conduct Has Deprived Citizens of Their Constitutional Rights. ............................................................ 10

III. Section 12601 Authorizes Plaintiff's Claim. ........................................................... 12

A. The Plain Language of Section 12601 Supports Granting Plaintiff Relief. .................. 12

B. The Remaining Canons of Statutory Interpretation Also Support Plaintiff. ................. 13

1. Section 12601 and Section 1983 Should Be Interpreted In Pari Materia. ................ 13

2. The legislative history of Section 12601 supports Plaintiff's claim. ........................ 15

3. The Court must construe Section 12601 broadly as a remedial statute. ................... 16

IV. Defendants' Argument That Section 12601 Does Not Apply Are Meritless ................ 17

A. Enforcing a Law Is Law Enforcement Conduct. ........................................................ 17

B. The Department's Past Practice Does Not Cabin the Scope of the Statute. ................. 18

REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION ............................. 20

I. Plaintiff Is Likely to Succeed on the Merits of Its Claim that Law Enforcement Implementation of Bill 23-26E Violates the Second Amendment. ......................................... 20

A. Bill 23-26E Fails under *Bruen*'s Two Step Analysis.................................................... 21

B. Bill 23-26E Implicates the Plain Text of the Second Amendment. .............................. 21

C. Bill 23-26E Is Inconsistent with the Nation's Historical Tradition of Firearm Regulation. ............................................................................................................. 23

II. Failure to Enjoin Defendants Will Result in Irreparable Harm. ...................................... 28

III. The Balance of Equities and the Public Interest Favor Injunctive Relief. .................... 29

CONCLUSION.............................................................................................................. 30

TABLE OF AUTHORITIES

**Cases**

*Andrews v. State*, 50 Tenn. 165 (1871) ... 28
*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ... 4, 5
*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N. J.*, 183 F.4th 211 (3d Cir. 2026) ... 28
*Austin v. Univ. of Or.*, 925 F.3d 1133 (9th Cir. 2019) ... 5
*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ... 5
*Berk v. Choy,* 607 U.S. 187 (2026) ... 5
*Branch v. Smith*, 538 U.S. 254 (2003) ... 13
*Brown v. City of Tulsa*, 124 F.4th 1251 (10th Cir. 2025) ... 18
*Bryant v. Woodall,* 1 F.4th 280 (4th Cir. 2021) ... 28
*California v. Texas*, 593 U.S. 659 (2021) ... 2
*Charboneau v. Davis*, 87 F.4th 443 (9th Cir. 2023) ... 18
*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ... 15, 16
*City of Los Angeles v. Preferred Commc'ns*, 476 U.S. 488 (1986) ... 19
*Conn. Nat. Bank v. Germain*, 503 U.S. 249 (1992) ... 12
*Cooksey v. Futrell*, 721 F.3d 226 (4th Cir. 2013) ... 2, 3, 4
*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) ... 2
*Dennis v. Higgins*, 498 U.S. 439 (1991) ... 14
*DiCocco v. Garland*, 52 F.4th 588 (4th Cir. 2022) ... 2, 4
*District of Columbia* v. *Heller*, 554 U.S. 570 (2008) ... 1, 22, 25
*Elrod v. Burns*, 427 U.S. 347 (1976) ... 28
*Engage Armament LLC v. Montgomery Cnty.*, 356 A.3d 79 (Md. 2026) ... 9
*English v. State*, 35 Tex. 473 (1872) ... 28
*Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91 (4th Cir. 2011) ... 2
*Ex parte Commonwealth of Virginia*, 100 U.S. 339 (1879) ... 9
*Ferguson v. City of Charleston*, 532 U.S. 67 (2001) ... 8, 9
*First Choice Women's Res. Centers, Inc. v. Davenport*, 608 U.S. 174 (2026) ... 29
*Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427 (2019) ... 13
*Fouts v. Bonta*, 718 F. Supp. 3d 1276 (S.D. Cal. 2024) ... 22
*Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002) ... 29
*Hardaway v. Nigrelli*, 639 F. Supp. 3d 422 (W.D.N.Y. 2022) ... 25
*Hill v. State*, 53 Ga. 472 (1874) ... 28
*Hudspeth v. Figgins*, 584 F.2d 1345 (4th Cir. 1978) ... 8
*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977) ... 7
*Johnson v. City of Shelby*, 574 U.S. 10 (2014) ... 11
*Kipke v. Moore*, 165 F.4th 194 (4th Cir. 2026) ... 22, 23, 26
*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ... 3

*Maryland Shall Issue, Inc. v. Montgomery County*, 680 F. Supp. 3d 567 (D. Md. 2023) 23, 24, 25
*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ........ 30
*Miranda v. Garland*, 34 F.4th 338 (4th Cir. 2022) ........ 28
*Mobil Oil Corp. v. Att'y Gen. of Com. of Va.*, 940 F.2d 73 (4th Cir. 1991) ........ 3
*Morissette v. United States*, 342 U.S. 246 (1952) ........ 7
*N. Y. State Rifle & Pistol Assn. v. Bruen*, 597 U.S. 1 (2022)1, 10, 11, 20, 21, 22, 23, 25, 28, 29, 30
*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ........ 18
*Puryear v. Cnty. of Roanoke*, 214 F.3d 514 (4th Cir. 2000) ........ 16
*Ramos v. Louisiana*, 590 U.S. 83 (2020) ........ 21
*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020), *as amended* (Jan. 14, 2020) ........ 30
*Sterling v. Borough of Minersville*, 232 F.3d 190 (3d Cir. 2000) ........ 8
*Tcherepnin v. Knight*, 389 U.S. 332 (1967) ........ 17
*United States EEOC v. Catholic Healthcare W.,* 530 F. Supp. 2d 1096 (C.D. Cal. 2008) ........ 7
*United States v. Am. Union Transp.*, 327 U.S. 437 (1946) ........ 19
*United States v. Balistrieri*, 981 F.2d 916 (7th Cir. 1992) ........ 5
*United States v. Bd. of Educ. for Sch. Dist. of Philadelphia*, 911 F.2d 882 (3d Cir. 1990) ........ 6
*United States v. City of Columbus*, 2000 WL 1133166 (S.D. Ohio 2000) ........ 14, 15
*United States v. City of Ferguson*, No. 4:16-cv-00180 (E.D. Mo. 2016) ........ 9, 17
*United States v. City of Philadelphia*, 644 F.2d 187 (3d Cir. 1980) ........ 15, 16
*United States v. Cnty. of Maricopa,* 889 F.3d 648 (9th Cir. 2018) ........ 13, 14, 18
*United States v. Dodge*, 963 F.3d 379 (4th Cir. 2020) ........ 26
*United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) ........ 19
*United States v. Freeman*, 44 U.S. (3 How.) 556 (1845) ........ 13
*United States v. Maricopa County*, 915 F. Supp. 2d 1073 (D. Ariz. 2013) ........ 18
*United States v. Nobel Learning Cmtys*, 676 F. Supp. 2d 379 (E.D. Pa. 2009) ........ 5
*United States v. Prashad*, 437 F. Supp. 3d 105 (D. Mass. 2020) ........ 5
*United States v. Rahimi*, 602 U.S. 680 (2024) ........ 22
*United States v. Town of Colorado City*, 935 F.3d 804 (9th Cir. 2019) ........ 18
*Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981) ........ 23
*Uronis v. Cabot Oil & Gas Corp.*, 49 F.4th 263 (3d Cir. 2022) ........ 17
*Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635 (2002) ........ 3
*Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383 (1988) ........ 10
*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765 (2000) ........ 2
*W. Va. Univ. Hosps. v. Casey*, 499 U.S. 83 (1991) ........ 12
*Wachovia Bank v. Schmidt*, 546 U.S. 303 (2006) ........ 13
*Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024) ........ 23
*Wolford v. Lopez*, 146 S. Ct. 2032 (2026) ........ 10, 11, 21, 22, 23, 24, 25, 26
*Ybarra v. Illinois*, 444 U.S. 85 (1979) ........ 30

**Statutes**

34 U.S.C. § 12601 ..................................... 1, 2, 3, 5, 6, 7, 8, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20
42 U.S.C. § 14141 .................................................................................................... 14, 17
42 U.S.C. § 1983 ................................................................................................... 13, 14, 15
Ku Klux Klan Act of 1871, ch. 22, 17 Stat. 13 ............................................................... 14
Montgomery County Emergency Bill 23-26 .........................1, 3, 4, 6, 9, 10, 11, 18, 21, 22, 25, 28
Violent Crime Control and Law Enforcement Act of 1994, 108 Stat 1796 ................................ 15

**Other Authorities**

1 *The Public Records of the Colony of Connecticut* (J. Hammond Trumbull ed. 1850) ............. 27
106 Cong. Rec. 7223 (Sen. Keating) ................................................................................... 7
19 *The Colonial Records of the State Of Georgia* (Allen D. Candler ed., 1904).......................... 27
3 Archives of Maryland (1642)........................................................................................... 27
Black's Law Dictionary, *Practice* (12th ed. 2024) ............................................................... 8
Ceoli Jacoby, Bethesda Today, *Montgomery County 'Not Going to Surrender' in Gun Law Dispute, Elrich Says*, Aug. 5, 2026, https://perma.cc/CD8C-KA85 ......................................... 9
H.R. 3371 (102d Cong. 1991)............................................................................................. 15
H.R. Rep. No. 102–242 (102nd Cong. 1991) ................................................................ 15, 16
JNS *"We're Still Carrying," Maryland Synagogue Security Volunteers Say*, Washington Jewish Week (August 17, 2026), https://perma.cc/7MUF-8EZX..................................................... 8, 9
Lyon Gardiner Tyler, *Narratives of Early Virginia, 1606-25* (1907) .......................................... 27
Rodney A. Smolla, *The History of § 1983—The Civil Rights Act of 1871*, 2 Federal Civil Rights Acts § 14:2 (3d ed. 2026)............................................................................................... 14
*Special Litigation Section Cases and Matters, Law Enforcement Agencies* ................................ 19
The Arena with America First Legal, *Reclaiming Civil Rights with Assistant Attorney General Harmeet Dhillon* (YouTube, June 1, 2026), https://www.youtube.com/watch?v=wdzUq0g5MJY ............................................................ 20
*The Compact with the Charter and Laws of the Colony of New Plymouth* (William Brigham ed., 1836) ............................................................................................................................ 27
U.S. Const. am. XIV ......................................................................................................... 8

**Rules**

Fed. R. Civ. P. 12(b)(1) ................................................................................................ 1, 2, 4
Fed. R. Civ. P. 12(b)(6) ...................................................................................................... 4
Fed. R. Civ. P. 54(b) ....................................................................................................... 23

## INTRODUCTION

This is a straightforward case. The Constitution protects the ability of the "people" to "keep and bear arms" for any lawful purposes including self-defense. *See District of Columbia* v. *Heller*, 554 U.S. 570, 624 (2008). This right extends to the ability to carry firearms in public. *See N. Y. State Rifle & Pistol Assn. v. Bruen*, 597 U.S. 1, 67 (2022). The United States brought this action because Defendants have violated 34 U.S.C. § 12601 ("Section 12601"), because law enforcement officers acting on behalf of Montgomery County are engaged in a pattern or practice of conduct (i.e., enforcing restrictions that infringe the right to keep and bear arms) that deprives persons of these Second Amendment rights).

Plaintiff moved for preliminary injunction against enforcement of Montgomery County's Emergency Bill 23-26 ("Bill 23-26E"). Defendants opposed and moved to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). This brief is divided into three parts, the first two of which respond to Defendants' motion, and the last one replies to Defendants' opposition to United States' motion for a preliminary injunction. In Part One, the United States demonstrates that the United States has standing and therefore the Court should deny Defendants' Rule 12(b)(1) motion. Defendants' argument that the United States does not have standing confuses the merits and standing questions. In Part Two, Plaintiff demonstrates that its Complaint plausibly alleges that Defendants have violated Section 12601 and therefore the Court should deny Defendants Rule 12(b)(6) motion. In Part Three, the United States demonstrates that entry of a preliminary injunction is appropriate because it is likely to prevail on the merits and the other *Winter* factors also favor injunctive relief.

## PART ONE
## RESPONSE TO MOTION TO DISMISS FOR LACK OF JURISDICTION

Defendants' misplaced reliance on Fed. R. Civ. P. 12(b)(1) challenging jurisdiction must fail.[1] Defendants "put the merits cart before the standing horse," *Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2013) (citation omitted), and confuse *standing* with *cause of action*.

Standing concerns the court's *power* to adjudicate the case. *See California v. Texas*, 593 U.S. 659, 668 (2021). "Standing does not turn on whether a plaintiff has definitively stated a valid cause of action." *DiCocco v. Garland*, 52 F.4th 588, 591 (4th Cir. 2022). Indeed, in determining whether a party has alleged a sufficient injury for standing purposes, the "court assumes the merits of a dispute will be resolved in favor of the party invoking [court's] jurisdiction . . . and, at the pleading stage, 'presumes that general allegations embrace those specific facts that are necessary to support the claim.'" *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 99 (4th Cir. 2011) (citation omitted).

To demonstrate standing, a plaintiff must "allege [1] personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3] likely to be redressed by the requested relief." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (internal quotation marks omitted). Here, the United States alleges Defendants have violated a federal statute, *viz.*, Section 12601. "It is beyond doubt" that the United States suffers an "injury to its sovereignty arising from violation of its laws," and that such an injury is sufficient to confer standing. *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000). The alleged injury is neither "conjectural" nor "hypothetical." Indeed, it "would be unreasonable to assume that [Montgomery County] adopted

---

[1] Consolidated Memorandum of Law in Support of Motion to Dismiss Complaint and in Opposition to Plaintiff's Motion for Preliminary Injunction [ECF 24-1] (Def. Memo.).

[Bill 23-26E] without intending that it be enforced." *Mobil Oil Corp. v. Att'y Gen. of Com. of Va.*, 940 F.2d 73, 76 (4th Cir. 1991) (internal citations and quotation marks omitted). For the purposes of conducting the threshold standing inquiry, the Court must assume Plaintiff's Section 12601 claim has legal validity. *Cooksey*, 721 F.3d at 239 (citation omitted). And given that Defendants have consistently refused to postpone enforcement of Bill 23-26E even for the short period necessary to adjudicate United States's (and the private plaintiffs') motions for preliminary relief, the conclusion that the allegations of enforcement are well pleaded is inescapable. Thus, the United States has satisfied the first prong of the standing inquiry.

There is no dispute that any injury that the United States suffers is attributable to Defendants' actions and that the injury would be redressed by entry of the equitable and declaratory relief that Section 12601 authorizes the United States to seek.[2] Thus, the remaining prongs of the standing inquiry are also satisfied.

Defendants assert they have not violated Section 12601 because Montgomery County law enforcement officers are supposedly not engaged in the type of "conduct … that deprives persons' of a federal right." Def. Memo. 9. Thus, according to Defendants, the United States lacks standing to assert its claim. That is wrong for two reasons. First, whether a statute authorizes a cause of action is unrelated to the Article III standing inquiry. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014) ("[T]he absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case.") (quoting *Verizon Md. Inc. v. Public Serv. Comm'n of*

---

[2] Defendants also rely upon past practices of Section 12601's enforcement in its standing argument. Standing, of course, is a separate concept from prosecutorial discretion and the argument is completely unavailing. In any respect, Plaintiff addresses these arguments in Part Two, Section III, below.

*Md.*, 535 U.S. 635, 642-43 (2002)). Second, Defendants confuse the *merits* of a claim with a plaintiff's *standing* to bring the claim in the first place.

In *Cooksey*, the Fourth Circuit rejected the argument that a plaintiff lacked standing to assert a First Amendment claim because the claim was allegedly defeated by the professional speech doctrine. 721 F.3d at 239. The same analysis applies here. Whether Defendants have "engage[d] in a pattern or practice of conduct by law enforcement officers . . . that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States," does not defeat the existence of a cognizable claim. That is a *merits* question, not a standing one. In determining whether Plaintiff has standing, the Court must assume the legal validity of Plaintiff's Section 12601 claim. Defendants' attack on the factual allegations of the Complaint also fails. For purposes of the standing analysis, a court accepts all well-pleaded facts in the complaint as true. *See DiCocco*, 52 F.4th at 591 (citations omitted). The Complaint alleges that numerous provisions of Bill 23-26E violate the Second Amendment. Compl. ¶ 3. And the Complaint alleges that Montgomery County law enforcement officers are charged with enforcing these unconstitutional restrictions and *are* doing so. *Id*. These facts are well pleaded. Accordingly, Defendants' standing arguments fail and their Rule 12(b)(1) motion should be denied.

## PART TWO
## RESPONSE TO MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Defendants' Motion to Dismiss must fail because: (a) Defendants cannot meet Rule 12(b)(6) standard; (b) Plaintiff has plausibly alleged a Section 12601 violation; and (c) Section 12601 authorizes the relief that Plaintiff seeks.

### I. Rule 12(b)(6) Motion Standard of Review.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quotations omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Factual allegations need not be detailed, but facts must be "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). At the pleading stage, a plaintiff does not need to state facts to establish a *prima facie* case of a pattern or practice. *Austin v. Univ. of Or.*, 925 F.3d 1133, 1136-1137 (9th Cir. 2019). Thus, to overcome a motion to dismiss in a pattern-or-practice case, the allegations need only create a reasonable inference that a pattern or practice exists. *See, e.g.*, *United States v. Prashad*, 437 F. Supp. 3d 105, 108-09 (D. Mass. 2020); *United States v. Nobel Learning Cmtys*, 676 F. Supp. 2d 379, 384 (E.D. Pa. 2009). Whether it exists is ordinarily a factual question for the jury and "each case must stand on its own facts." *United States v. Balistrieri*, 981 F.2d 916, 930 (7th Cir. 1992). A complaint that plausibly asserts facts supporting a plaintiff's claims, "may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable." *Berk v. Choy,* 607 U.S. 187, 193 (2026) (quoting *Twombly*, 550 U.S. at 556). "By design, this system of pleading makes it relatively easy for plaintiffs to subject defendants to discovery . . .." *Id.* at 194. The Supreme Court has "consistently rejected" efforts to require more. *Id*.

## II. Plaintiff Has Plausibly Pleaded a Claim under Section 12601.

### A. A Section 12601 Claim Has Three Elements.

To state a claim under Section 12601, the United States must plausibly allege three elements: (1) a "governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority;" (2) "engage[d] in a pattern or practice of conduct by law enforcement officers;" and (3) that conduct operated to "deprive[] persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." 34 U.S.C. § 12601. Nothing more is required.

**B. Element One: Section 12601 Applies to Defendants.**

The Complaint undisputedly alleges that Montgomery County is a governmental authority, as that term is used in Section 12601. Montgomery County Police Department (MCPD) is an agency of that governmental authority that acts on behalf of that authority to, *inter alia*, enforce Montgomery County's legal enactments. Compl. ¶¶51-52. The Complaint further alleges that the Sheriff, though an independent state constitutional officer, has the power to, and does act on behalf of Montgomery County to enforce the laws of that county.

The Complaint alleges, *see* Compl. ¶¶44, 46-49, 52, (and Defendants do not dispute) that MCPD officers and Sheriff Uy are law enforcement officers within the meaning of Section 12601. Defendants do not suggest that these allegations are not plausible (nor could they). Therefore, it is undisputed that Plaintiff has plausibly alleged that Defendants are governmental authorities, and that MCPD officers and Sheriff Uy are law enforcement officers responsible for enforcing Montgomery County statutes. Plaintiff's Complaint meets the first element.

**C. Element Two: A Pattern or Practice of Law Enforcement Conduct Exists.**

Defendants claim there cannot be a "pattern or practice" of misconduct by Defendants because there is no record of "enforcement" of Bill 23-26E. This argument is meritless because an openly declared policy to enforce unconstitutional laws amounts to a "pattern or practice." In the context of civil rights enforcement, courts have long held "pattern or practice" can be established by pointing to *either* defendants' actions *or* defendants' openly stated policy, including enactment of an unlawful statute. *See United States v. Bd. of Educ. for Sch. Dist. of Philadelphia*, 911 F.2d 882, 892 (3d Cir. 1990) ("Where the allegedly discriminatory policy is openly declared—in this case it was, among other things, published in the Pennsylvania Code—then proof that the

policy was actually being followed consistently is not necessary in order to obtain an injunction against subsequent implementation."); *United States EEOC v. Cath. Healthcare W.,* 530 F. Supp. 2d 1096, 1101-04 (C.D. Cal. 2008); *see also* 106 Cong. Rec. 7223 (Sen. Keating) ("[A] single act such as enactment of a statute directed at Negroes [sic] would in itself constitute a pattern or practice of discrimination.").

By the time Congress enacted Section 12601, the phrase "pattern or practice of conduct" was a term of art with a well-established meaning in civil rights law. *See generally Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977). The Court should therefore presume that Congress intended to adopt that accepted meaning. *See Morissette v. United States*, 342 U.S. 246, 263 (1952) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meanings of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word . . .."). The United States has validly alleged a pattern or practice under 12601 because Defendants adopted and implemented a stated, statutory policy to arrest persons who carry firearms at certain places or a buffer zone around those places.

Defendants' argument that the United States must allege a pattern of arrests and prosecutions prior to seeking relief is foreclosed by the consistent judicial interpretation of the "pattern or practice" clause. This argument also leads to absurd results. For example, consider a hypothetical where a city has a policy of having law enforcement officers arrest black citizens who attempt to vote. Under Defendants' logic, the United States would be powerless to act until a sufficiently large number of such arrests were made (because presumably, a single arrest may not rise to a level of a "pattern"), and a sufficiently large number of black citizens were disenfranchised. The absurdity of this proposition is self-evident.

The phrase "pattern or practice" is disjunctive. Thus, liability under Section 12601 attaches if there is a "pattern" of law enforcement conduct *or* if there is a "practice" of law enforcement conduct. Defendants insist the phrase means only a past pattern of conduct of making arrests. But that interpretation leaves the word "practice" as mere surplusage doing no work. The two words do not mean the same thing. A "practice" as opposed to a "pattern" means a prescribed course of conduct. *See* Black's Law Dictionary, *Practice* (12th ed. 2024) ("Practice" means "prescribed usage").

Establishing a policy of arresting people under certain conditions (i.e., a "practice") has the same goal as actually making arrests. Both compel or prohibit conduct. *Cf. Ferguson v. City of Charleston*, 532 U.S. 67, 84 (2001) ("[T]he threat of arrest and prosecution" was used "to force women into treatment . . .."). In similar contexts, law enforcement's threat of prosecution for merely exercising a constitutional right, itself, imposed liability on the law enforcement agency. *See Sterling v. Borough of Minersville*, 232 F.3d 190, 196 (3d Cir. 2000) ("Simply put, threats accompanied by a 'chilling effect' that deny or hinder the exercise of a constitutional right have been deemed cognizable" under § 1983); *Hudspeth v. Figgins*, 584 F.2d 1345, 1348 (4th Cir. 1978) (per curiam) ("A threat of physical harm to a prisoner if he persists in his pursuit of judicial relief is as impermissible as a more direct means of restricting the right of access to the courts. . . . It is enough that the threat was intended to impose a limitation upon the prisoner's right of access to the court and was reasonably calculated to have that effect."). Law enforcement officers charged and instructed to "enforce [such regulations] the same way as every other law," JNS, *infra* n.3, are engaged in a "pattern or practice" of enforcement.

When, as here, Defendants have stated their practice is to restrict constitutionally protected rights, Section 12601 authorizes the Attorney General to seek injunctive relief. Far from being an

insult to the "sovereignty of state and local law enforcement," Def. Memo. 14, Congress had full authority to enact Section 12601. *See* U.S. Const. am. XIV (authorizing "appropriate legislation" to enforce the amendment). Indeed, the very purpose of the Fourteenth Amendment was to restrict state power—restrictions "which Congress is empowered to enforce, and to enforce against State action, however put forth." *Ex parte Commonwealth of Virginia*, 100 U.S. 339, 346 (1879). There is nothing at all illogical or far-fetched about the Attorney General seeking to enjoin continued enforcement of unconstitutional statutes by state or local law enforcement officers.[3]

Defendants' argument that permitting this suit to proceed would "make the Justice Department the arbiter of all criminal law enforcement in America" is meritless. Defendants misrepresent the nature of the Complaint. The United States is not mounting a facial challenge to Bill 23-26E. Rather, the United States alleges that Defendants are engaged in a pattern or practice of deprivation of people's right to keep and bear Arms. This action is not different than the consent decree that the United States entered into with the City of Ferguson, Missouri which enjoined law enforcement officers of that city from continuing to enforce an unconstitutional ordinance. *See* *United States v. City of Ferguson*, No. 4:16-cv-00180 (E.D. Mo. April 19, 2016), ECF 41, ¶¶ 38, 92.[4]

[3] Defendants' allegations of nonenforcement are disingenuous for at least two reasons. First, the enforcement of the prior version of the bill has been enjoined by Maryland state courts. *See Engage Armament LLC v. Montgomery Cnty.*, 356 A.3d 79, 94-95 (Md. 2026) (discussing injunctions entered by Maryland courts). Thus, prior non-enforcement was not voluntary but rather subject to injunctive relief just as enforcement the new law should be. Second, the County Executive has made it clear that he is "not going to surrender" and will continue to press for enforcement of Bill 23-26E. Ceoli Jacoby, Bethesda Today, *Montgomery County 'Not Going to Surrender' in Gun Law Dispute, Elrich Says*, Aug. 5, 2026, https://perma.cc/CD8C-KA85. The county police have specifically stated that they intend to enforce Bill 23-26E the same way as "every other law." *See* JNS *"We're Still Carrying," Maryland Synagogue Security Volunteers Say*, Washington Jewish Week (August 17, 2026), https://perma.cc/7MUF-8EZX (quoting Degan Bartels—the public information officer for the Montgomery County Police Department). Thus, the County Executive with authority over the law enforcement agencies' budgets has plainly admitted the Defendants' practice.

[4] Indeed, the Consent Decree in *Ferguson* was significantly more far-reaching than merely enjoining police officers from enforcing an unconstitutionally broad statute. It also required amendments to Ferguson's Municipal Code and

The Complaint alleged that MCPD police officers and Sheriff Uy (along with his deputies) have and exercise the authority to arrest individuals who violate Montgomery County laws, including Bill 23-26E. Comp. ¶ 48. Defendants, of course, do not dispute this. Nor do they dispute that when such law enforcement officers perform their duty pursuant to their constitutional, statutory, and common law authority, they are engaging in "conduct by law enforcement officers" as that phrase is used in Section 12601. Instead, Defendants attempt to raise a factual dispute at the motion-to-dismiss stage about the extent to which Bill 23-26E has been enforced. The Complaint's allegation that Defendants are enforcing their own laws are plausible and therefore must be accepted as true at this stage of the litigation. Moreover, as explained above, a declaration of official policy, standing alone, is sufficient to establish a pattern or practice.

Defendants have had ample opportunity to disavow enforcement of Bill 23-26E and have not done so. It is appropriate, then, to presume the Bill's enforcement. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). Defendants have not disavowed enforcement because they have no plans to leave the prohibitions—enacted *on an emergency basis*—unenforced. In summary, the Complaint plausibly alleges that MCPD and Sheriff Uy engage in the pattern or practice of conduct of enforcing Montgomery County's criminal laws including Bill 23-26E. Plaintiff's Complaint meets the second element through plausible allegations of a pattern or practice of law enforcement misconduct.

### D. Element Three: Plaintiffs Have Plausibly Alleged That Defendants' Conduct Has Deprived Citizens of Their Constitutional Rights.

barred the City from reinstating previously repealed provisions. *Ferguson*, No. 4:16-cv-00180, ECF 41, ¶¶ 36-40. The relief the United States seeks here is significantly more modest.

In *Wolford*, the Supreme Court summarized the two-part *Bruen* test required in a Second Amendment case. *Wolford v. Lopez*, 146 S. Ct. 2032, 2043 (2026). "First, a court must determine whether the law before it clashes with the 'plain text' of the Amendment's language." *Id*. (citation omitted). This inquiry requires the Court to ask three subsidiary questions: (1) Does the law apply to "the people"? (2) Does it concern any form of "Arms"? (3) Does the law place any restrictions on either the possession or carrying of arms? *Id*. (cleaned up). "If a challenged law falls within the plain text of the Second Amendment, it is presumptively unconstitutional[.]" *Id*. (citation omitted). The "relevant government"—here, Defendants—can rebut that presumption by showing that its law did not infringe the historical understanding of the right to keep and bear arms codified in the Second Amendment. *Id*.

A plaintiff's pleading burden under *Bruen* step one (as clarified in *Wolford*) is very light. To state a Second Amendment claim, a plaintiff need only plausibly plead the three elements under step one: (1) The law applies to "the people," (2) the law concerns any form of arms, and (3) the law places any restriction on either the possession or carrying of arms. *Wolford*, 146 S. Ct. at 2043. It is not necessary for Plaintiff to anticipate and counter Defendants' *Bruen* step two arguments—especially given that a plaintiff need only plead "the factual basis" of the complaint and need not "'set out a legal theory.'" *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014).

The United States has met its pleading burden.[5] The Complaint plausibly (indeed irrefutably) answers all three of *Wolford*'s step one questions in the affirmative. First, Bill 23-26E applies to the people. Bill 23-26E applies to all citizens of and visitors to Montgomery County. Compl. ¶¶ 44-54. Second, the law concerns all firearms. Compl. ¶¶ 13. And third, the law bans

[5] Here, Plaintiff discusses only its pleading burden in response to Defendants' Rule 12(b)(6) motion. In Part Three, *infra*, Plaintiff will discuss why Defendants are unlikely to carry *their* burden at *Bruen* step two, and therefore why the United States is likely to prevail on the merits of its claims in support of its motion for preliminary injunction.

the possession of *any firearms* at certain locations. Compl. ¶¶ 13-15, 30-38. These allegations cannot be reasonably disputed, because the allegations merely restate the text of Bill 23-26E. As with the other elements, Plaintiff has met the third element. In summary, the United States has more than met its pleading burden for a Section 12601 claim. The Court should, therefore, deny Defendants' Motion to Dismiss.

## III. Section 12601 Authorizes Plaintiff's Claim.

### A. The Plain Language of Section 12601 Supports Granting Plaintiff Relief.

By design, Section 12601's protection against law enforcement misconduct includes protection against myriad iterations of unconstitutional policing—including the allegations raised in the Complaint. The "cardinal canon" of statutory construction is that a "legislature says in a statute what it means and means in a statute what it says there" regardless of whether "*legislative history points to a different result.*" *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253-254 (1992) (emphasis added). Accordingly, when the words of a statute are unambiguous, this first canon is also the last and the "judicial inquiry is complete." *Germain*, 503 U.S. at 254 (citations and internal quotation marks omitted).

The best evidence of the purpose of a statute is therefore the statutory text itself. *W. Va. Univ. Hosps. v. Casey*, 499 U.S. 83, 98-99 (1991) ("Where [statutory text] contains a phrase that is unambiguous . . . [courts] do not permit it to be expanded or contracted by the statements of individual legislators or committees during the course of the enactment process."). The dispute, here, concerns the scope of law enforcement misconduct prohibited by the statute. The plain text of the statute manifestly prohibits *all* law enforcement conduct that deprives people of their constitutional rights. Defendants argue that the statute prohibits only *some* law enforcement conduct that deprives people of their rights. They contend that enforcement of an unconstitutional law is not conduct within the meaning of Section 12601. Defendants are wrong. The statute is

simple and unambiguous, and its broad remedial scope is inescapable to any reasonable reader. The plain text authorizes the United States to seek an injunction when law enforcement officers "engage in a pattern or practice of conduct" that operates to deprive persons of their constitutional rights. Enforcing an unconstitutional law obviously deprives persons of their constitutional rights. Therefore, the statute authorizes the United States to seek to enjoin such conduct.

**B. The Remaining Canons of Statutory Interpretation Also Support Plaintiff.**

Because the plain text of Section 12601 authorizes the Attorney General to initiate this suit, the judicial inquiry should be at an end. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019). Defendants' exegesis on the history of the statute, much less their delving into Department of Justice's decades-old internal policies is unnecessary and irrelevant to the elucidation of the statutory meaning. But even if the Court were interested in taking this unnecessary detour, it would still end up at the same conclusion, *viz.*, Section 12601 authorizes this suit.

**1. Section 12601 and Section 1983 Should Be Interpreted In Pari Materia.**

Under the *in pari materia* canon, statutes that address the same subject matter should be construed consistently with each other. *See Wachovia Bank v. Schmidt*, 546 U.S. 303, 305 (2006); *see also Branch v. Smith*, 538 U.S. 254, 281 (2003) (holding that "if divers statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them") (quoting *United States v. Freeman*, 44 U.S. (3 How.) 556, 564 (1845)).

Section 12601 and 42 U.S.C. § 1983 ("Section 1983") are sister statutes in that both create a broad remedy for redressing violations of all federally protected civil rights, the former in actions by the United States and the latter in actions by private litigants. *See United States v. Cnty. of Maricopa,* 889 F.3d 648, 653 (9th Cir. 2018). As the Ninth Circuit explained, Congress enacted Section 1983 to create a broad remedy for violations of federally protected civil rights. *Id.*

Likewise, Congress enacted Section 12601 as a remedy for violations of federal civil rights. *Id*. Both statutes impose liability on local governments. *Id*. "Indeed, *the language of § 12601 goes even further than § 1983*, making it unlawful for 'any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority' to engage in the prohibited conduct." *Id*. (emphasis added).[6] Given these similarities, the statutes plainly should be interpreted *in pari materia*.

The history of Section 1983 informs the broad reach of Section 1983, just like Section 12601 should be read. Congress enacted Section 1983 as part of the Ku Klux Klan Act of 1871, ch. 22, 17 Stat. 13 (the "Klan Act"). As the name of the Klan Act implies, the members of the 42nd Congress who voted to enact Section 1983 had a very specific problem in mind—vindicating the constitutional rights of the freedmen. "Despite its noble beginnings, § 1983 remained in disuse for nearly a century." Rodney A. Smolla, *The History of § 1983—The Civil Rights Act of 1871*, 2 Federal Civil Rights Acts § 14:2 (3d ed. 2026) (citations omitted). Fortunately, Section 1983 eventually emerged as a powerful engine for vindicating deprivations of constitutional rights by government actors, even where the deprivation has nothing to do with the Klan or racial motives. The Supreme Court held that "[a] broad construction of Section 1983 is compelled by the statutory language, which speaks of deprivations of any rights, privileges, or immunities secured by the Constitution and laws." *Dennis v. Higgins*, 498 U.S. 439, 443 (1991) (citation and internal quotation marks omitted).

Section 12601 was meant to parallel Section 1983 in its scope and remedial purpose. And even if Defendants are correct in their blinkered understanding of Congress's immediate

---

[6] *See also United States v. City of Columbus*, No. 2:99CV1097, 2000 WL 1133166, at *7 (S.D. Ohio Aug. 3, 2000) (explaining that the grant of authority to the Attorney General reflected Section 12601 (which was then codified at 42 U.S.C. § 14141) "was drafted in light of and was intended to remedy the inadequacies of 42 U.S.C. § 1983.").

motivations for enacting Section 12601 (though for reasons explained in the following subsection, they are not), that understanding does not get them very far. Simply put, the scope of Section 12601 is no more limited to addressing the problem the members of the 103rd Congress considered when they voted for the Crime Act than the scope of Section 1983 is limited by what the members of the 42nd Congress were thinking when they passed the Klan Act. As with Section 1983, the specific context in which Congress enacted the statute and the history of the statute's enforcement in no way limit the scope of the United States' enforcement authority. Rather, for both statutes, the plain text of the relevant statute controls, and the Court should read them consonantly with one another. And, because Section 12601 contains language that is nearly identical to the language that of Section 1983, the Court should give it equally broad construction.

**2. The legislative history of Section 12601 supports Plaintiff's claim.**

In 1994, Congress passed Section 12601 as part of the Violent Crime Control and Law Enforcement Act of 1994, 108 Stat 1796 (the "Crime Act"). While there is no direct legislative history on Section 12601, this section is similar to a provision of H.R. 3371, a failed bill that would have enacted a statute called the Omnibus Crime Control Act of 1991 (the "1991 Bill"). *City of Columbus*, 2000 WL 1133166, at *3. Significantly, the legislative history of the 1991 Bill states: "The standards of conduct under the Act *are the same as those under the Constitution*, presently enforced in damage actions under section 1983." H.R. Rep. No. 102–242, 102nd Cong., 1st Sess. at 138 (emphasis added) (the "Committee Report"). Thus, Congress explicitly contemplated an extremely broad remedy for the United States to redress violations of any constitutional right similar to the already extant broad remedy available to private litigants under Section 1983.[7]

[7] While the legislative history of the 1991 Bill discusses the Rodney King incident and other incidents of similar police misconduct, nothing in that legislative history supports Defendants' argument that the text must be strictly limited to apply only to incidents of that nature.

Moreover, Congress was particularly concerned with and sought to legislatively abrogate cases like *United States v. City of Philadelphia*, 644 F.2d 187 (3d Cir. 1980), and *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). The Committee Report stated that *City of Philadelphia* limited the Attorney General's authority to seek injunctive relief to remedy constitutional violations, while *Lyons* limited private litigants' ability to obtain injunctive relief against future constitutional violations as opposed to money damages for past violations. Committee Report, at 137-38. Congress viewed the limitations imposed by these two decisions as a problem that needed to be remedied. Congress perceived *City of Philadelphia*'s constraints on the United States' "authority to sue a local government or its officials to enjoin violations of citizens' constitutional rights by police officers" as "a serious and outdated gap in the federal scheme for protecting constitutional rights." *Id*. at 137. The point of Section 12601 was therefore, at least in part, a reaction not just to the Rodney King incident, but also against constraints on the United States' authority to seek injunctive relief in response to constitutional violations by local law enforcement officials. Congress fully intended to and consciously gave the Attorney General broad and robust authority to address such violations.[8]

The legislative history is as clear as the plain text of the law. In enacting Section 12601, Congress exercised its Fourteenth Amendment power and conferred on the Attorney General broad authority to remedy civil rights violations committed by law enforcement officers. The Court should reject Defendants' argument to the contrary.

**3. The Court must construe Section 12601 broadly as a remedial statute.**

[8] Similarly, Congress enacted the Civil Rights for Institutionalized Persons Act, 42 U.S.C. § 1997, to ensure that the United States could vindicate the rights of Americans in institutional settings following the Ninth Circuit's holding in *United States v. Mattson*, 600 F.2d 1295 (1979). Both enactments support Plaintiff's broad authority to obtain equitable remedies for any pattern or practice of constitutional violations.

Defendants do not dispute that Section 12601 is a remedial statute. When it comes to "remedial statutes, courts must construe the legislation broadly to effect its purposes." *Puryear v. Cnty. of Roanoke*, 214 F.3d 514, 522 (4th Cir. 2000). *See also Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967). Conversely, the Court should reject Defendants' efforts to impose a "narrow" or "grudging" interpretation on the statute. *See Uronis v. Cabot Oil & Gas Corp.*, 49 F.4th 263, 269 (3d Cir. 2022).

## IV. Defendants' Argument That Section 12601 Does Not Apply Are Meritless

### A. Enforcing a Law Is Law Enforcement Conduct.

The text of the Section 12601 proscribes law enforcement officers from engaging in "a pattern or practice of conduct" that deprives persons of their constitutional rights. Defendants argue this does not apply to law enforcement officers enforcing an unconstitutional law. This is not true. Whatever else it is, "enforcing a law" is certainly conduct. So, too, is the public admonition that the unconstitutional law will be "enforced." And a violation of Section 12601 occurs if that conduct results in the deprivation of persons' constitutional rights.

The United States previously applied this plain statutory language to an analogous pattern of practice of law enforcement conduct that deprived persons of their constitutional rights. The enforcement of a statute was part of the basis of the United States' Section 12601 claim against the Ferguson Police Department. Specifically, the police department's enforcement of the city's "Failure to Comply" ordinance was law enforcement conduct that deprived the citizens of Ferguson of their constitutional rights. *See United States v. City of Ferguson*, No. 4:16-cv-00180 (E.D. Mo. Feb. 10, 2016), ECF 1 at ¶¶45-46, 51, 62, 74, 88, 186.

Defendants argue that only a certain kind of conduct is proscribed by the statute, i.e., the use of excessive force.[9] Def. Memo. 11. But nothing in the statute implies (much less requires) that limit. "Had Congress intended to impose such a limitation, it could easily have [used those] simple word[s]. But it did not do so, and [courts] cannot rewrite the statute to insert an additional restriction that Congress omitted." *Charboneau v. Davis*, 87 F.4th 443, 454 (9th Cir. 2023).

The only two cases that have addressed this issue have held that enforcement of a municipality's official policy[10] is actionable under Section 12601. *See Maricopa*, *supra*, and *United States v. Town of Colorado City*, 935 F.3d 804, 810 (9th Cir. 2019). *Colorado City* also undercuts Defendants' argument that Section 12601 is applicable only in excess force cases. In that case, which was one of the Civil Rights Division's major enforcement actions, the defendants violated the Establishment Clause of the First Amendment. *See Colorado City*, 935 F.3d at 806. There were no allegations of excess force. In *Maricopa County*, the allegations of misconduct included filing baseless lawsuits in retaliation for exercising First Amendment rights.[11] Likewise, Defendants' conduct fits this mold and is actionable under Section 12601.

**B. The Department's Past Practice Does Not Cabin the Scope of the Statute.**

According to Defendants, in the past, the Civil Rights Division has focused exclusively on excessive force cases and has not enforced Section 12601 the way it is enforcing the statute in this

---

[9] There is no support for Defendants' limited view of Section 12601's scope. According to Westlaw, as of August 14, 2026, Section 12601 (or, as it was previously codified, 42 U.S.C. § 14141) has been cited in 660 cases. Plaintiff's counsel reviewed all 660 cases. In the overwhelming majority of those cases (approximately 95%), courts dismissed *pro se* plaintiffs' attempts to assert a private right of action under the statute or mentioned the statute only incidentally in their discussion of other issues. Of the handful of remaining cases, only six courts engaged in any meaningful analysis of the statutory text. Based on this exhaustive research, no court has ever held that Section 12601 should be interpreted to radically narrow the reach of its plain text as Defendants suggest.

[10] Bill 23-26E is obviously the County's official policy. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (act of a "[legislative] body unquestionably constitutes an act of official government policy").

[11] *United States v. Maricopa County*, 915 F. Supp. 2d 1073, 1081 (D. Ariz. 2013).

action.[12] Even if the Court were to consider the matters that Defendants raised, their discussion of past agency practice would not move the needle in favor of their motion for several reasons. First, the Defendants' assertions are false.[13] The Division's past practice has not been as limited as Defendants suggest.[14]

More importantly, even if the Department is enforcing the statute in a way that is different from its past practice, that has no relevance to the scope of the authority Congress granted to the Attorney General in Section 12601. Different administrations have different priorities, and the agency practice in prior administrations does not delineate the scope of the authority set forth in a statute. Nor does it bind the agency or preclude it from deviating from that practice in the future. *See United States v. Am. Union Transp.*, 327 U.S. 437, 454 n.18 (1946) ("An administrative agency is not ordinarily under an obligation immediately to test the limits of its jurisdiction. It may await an appropriate opportunity or clear need for doing so. . . . Authority actually granted by Congress of course cannot evaporate through lack of administrative exercise.") (internal citations and quotation marks omitted); *see also United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 590 (1957) (the mere failure of an administrative agency to act is in no sense "a binding

---

[12] It would be improper, in any respect, for the Court to go beyond the "four corners" of the Complaint. *Brown v. City of Tulsa*, 124 F.4th 1251, 1263 (10th Cir. 2025). Moreover, Defendant's allegations about the scope of past agency practice are contested, and that factual dispute cannot be resolved in Defendants' favor at this stage of the litigation.

[13] Here, Defendants want this Court to decide their motion to dismiss on the basis of a disputed factual claim. The Court should decline to do so. *City of Los Angeles v. Preferred Commc'ns*, 476 U.S. 488, 494 (1986).

[14] Past administrations have exercised their prosecutorial discretion to use Section 12601 to investigate and bring enforcement actions to remedy: enforcement of local ordinances that are facially unconstitutional; First, Fourth, Sixth, Eighth, and Fourteenth Amendment violations, Title VI violations, and to challenge the conduct of law enforcement exercised through court clerks, prosecutors, non-sworn staff, and sworn officers and deputies. *See Special Litigation Section Cases and Matters, Law Enforcement Agencies*, https://www.justice.gov/crt/special-litigation-section-cases-and-matters#police. Arguably, some of the findings that past administrations have reached have identified alleged misconduct beyond the bounds of a constitutional or federal statutory requirement, but none has suffered the opposition offered here.

administrative interpretation" that it lacks the authority to do so). Accordingly, the exercise of prosecutorial discretion provides no basis for Defendant's Motion.

Finally, Defendants misrepresent Assistant Attorney General Dhillon's statements from a recent interview. Defendants assert that Assistant Attorney General Dhillon stated that the Department's use of Section 12601 is "revolutionary," implying that the way the Department is using the statute (i.e., targeting law enforcement conduct that violates civil rights) in a way it has never been done before. This is misleading and immaterial. What Assistant Attorney General Dhillon said is that the Department's attention to the previously neglected civil right to "keep and bear Arms" is revolutionary. *See* The Arena with America First Legal, *Reclaiming Civil Rights with Assistant Attorney General Harmeet Dhillon*, at 33:30-33:40 (YouTube, June 1, 2026), https://www.youtube.com/watch?v=wdzUq0g5MJY ("And so, I think this is just one of the most important and revolutionary changes to the Civil Rights Division is [its attention to] this neglected right."). In any event, whatever meaning may be ascribed to Assistant Attorney General Dhillon's podcast statement in no way limits the United States' statutory authority under Section 12601 to remedy the types of civil rights violations in which Defendants engage.

## PART THREE
## REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Just as Defendants last attempt to restrict Second Amendment rights was properly enjoined, so too must Defendants' current pattern or practice of law enforcement misconduct be enjoined because, under Section 12601: (a) Plaintiff's claim is likely to succeed on the merits; (b) Defendants' unconstitutional practice causes irreparable harm; and (c) the equities and public interest favor the Constitution over law enforcement misconduct.

### I. Plaintiff Is Likely to Succeed on the Merits of Its Claim that Law Enforcement Implementation of Bill 23-26E Violates the Second Amendment.

**A. Bill 23-26E Fails under *Bruen*'s Two Step Analysis.**

"[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17. The burden then shifts to the government to "justify its regulation." *Id.* At that point, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Only then "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.*

*Bruen* further cabined review of relevant history to a narrow time period, because "not all history is created equal." *Id*. at 34. Rather, the Court focused on the period around the ratification of the Second Amendment, and *perhaps* the Fourteenth Amendment, but only to the extent that it "mere[ly] confirm[s]" a Founding-era tradition. *Id.* at 37. Indeed, the Court noted that "post-ratification" interpretations "cannot overcome or alter that text," and "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id*. at 36, 37. *See also id*. at 37-60 (discussing the lack of relevant historical prohibitions on concealed carry in public); *Ramos v. Louisiana*, 590 U.S. 83, 94 (2020) (explaining that the Supreme Court has "rejected the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights") (cleaned up).

**B. Bill 23-26E Implicates the Plain Text of the Second Amendment.**

Defendants claim that Bill 23-26E "does not implicate the Second Amendment." Def. Memo. 18. That argument borders on the frivolous and is directly foreclosed by both Supreme Court and Fourth Circuit precedent. First, any law that places any restrictions on the ability of the people to either possess or carry "Arms" implicates the plain text of the Second Amendment. *See Wolford*, 146 S. Ct. at 2043 (citing *Bruen*, 597 U.S. at 32-33). Whether a particular restriction on

possessing and carrying of Arms can survive a Second Amendment challenge is not part of this inquiry. *See id.* at 2049 (explaining that arguments about the right to armed entry into private property "are out of place at *Bruen*'s first step" where the inquiry is fixed on the right to bear arms. "At that stage, the question is simply whether a challenged law falls within the Second Amendment's plain text.") (internal citations and quotations omitted). Second, the Fourth Circuit specifically held that "[s]ensitive-place laws 'directly impact the right to bear' arms and are therefore . . .' subject to *Bruen*'s historical analysis' at step two." *Kipke v. Moore*, 165 F.4th 194, 207 (4th Cir. 2026) (citation omitted).

Bill 23-26E which prohibits the possession and the carrying of firearms in wide swaths of the County. Compl. at ¶ 30.[15] Therefore, its enforcement implicates the plain text of the Second Amendment and the inquiry under *Bruen*'s step one is complete. And because the "challenged law falls within the plain text of the Second Amendment, it is presumptively unconstitutional." *Wolford,* 146 S. Ct. at 2044.

Defendants attempt to counter by citing *Heller*, *Bruen* and *United States v. Rahimi*, 602 U.S. 680 (2024). *See* Def. Memo. 18-19. Defendants' appeal to these cases is unavailing. First, as just discussed, these considerations have no place at *Bruen*'s step one. Second, Bill 23-26E is not a "longstanding law." The law at issue in *Bruen* was enacted in 1911, and the Court held it was not longstanding enough to be saved. *See Bruen,* 597 U.S. at 11. *See also Fouts v. Bonta*, 718 F. Supp. 3d 1276, 1280 (S.D. Cal. 2024) (acknowledging that after *Bruen*, a "statute enacted in 1923 is no longer given a pass for being 'longstanding.'"). *A fortiori*, Bill 23-26E, the predecessor of which was enacted only in 1997, is not longstanding.

---

[15] Defendants are wrong in their assertion that the United States challenged only those provisions of Bill 23-26E "involving sensitive places." To the contrary, the United States also challenged the buffer zones—a provision that Montgomery County does not even bother to defend. *See* Comp. at ¶¶ 24, 30-31, 33, 35, 37, 39, 42.

### C. Bill 23-26E Is Inconsistent with the Nation's Historical Tradition of Firearm Regulation.

Defendants are thus reduced to arguing that Bill 23-26E is consistent with this Nation's historical tradition of regulating firearms in "sensitive places." But Defendants cannot create, by *ipse dixit*, various places designated as "sensitive" and then restrict firearms at those places. Rather, Defendants must justify the restriction at each type of place separately, by pointing to a historical tradition of restrictions at similar places. *See Wolford v. Lopez*, 116 F.4th 959, 980-81 (9th Cir. 2024), *rev'd on other grounds by Wolford*, 146 S. Ct. 2032.

Defendants first argue that this Court's decision in *Maryland Shall Issue, Inc. v. Montgomery County*, 680 F. Supp. 3d 567 (D. Md. 2023) ("*MSI*"), and the Fourth Circuit's decision in *Kipke* resolve this case in their favor. They are wrong for the simple reason that the Supreme Court's has abrogated *Kipke*'s analytical framework. While *Kipke* allowed analogues from all time periods, the *Wolford* Court made clear that statutes "adopted nearly a century after the adoption of the Second Amendment and well after the adoption of the Fourteenth Amendment shed[] little if any light on the meaning of the Second Amendment right." 146 S. Ct. at 2053. Thus, the Fourth Circuit's approach of, "at *Bruen* step two" relying on "sources" from "throughout American history," *Kipke*, 165 F.4th at 207, is no longer a valid methodology.

Defendants' reliance on this Court's analysis in *MSI* is equally misplaced. First, *MSI* was decided prior to *Wolford* and now must be reconsidered under Wolford's mandate. Moreover, because *MSI* was decided on the motion for a preliminary injunction, it is not even precedent in *that* case, much less in the present one. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits . . .."); Fed. R. Civ. P. 54(b) (providing that any order that "adjudicates fewer than all the claims or the rights … of fewer than all of the parties . . . may be

revised at any time before entry of a judgment adjudicating all the claims and all the parties' rights").

In *MSI*, the Court cited to laws "from the time period of ratification of the Fourteenth Amendment" banning firearms in places of worship that Defendants also rely on here as historical analogues for the County's ban on firearms in places of worship. *MSI*, 680 F. Supp. 3d at 585; Def. Memo. 21-22. Yet, neither Defendants nor the Court cited evidence of *why* those laws were enacted. The Court stated that "the considerations of 'how and why' historical regulations burden rights relating to firearms are applicable not when there is clear historical example of the exact same type of regulation . . . but . . . only when the Court [must] reason by analogy in order to uphold a new form of restriction that did not exist at the time of the ratification." *MSI*, 680 F. Supp. 3d at 587. However, *Wolford* rejected that approach, with the Supreme Court specifically instructing lower courts that they "*must* . . . consider why the analogue restricted the keeping or bearing of arms—that is whether its rationale was similar to that of the new law." *Wolford*, 146 S. Ct. at 2044 (emphasis added). Consideration of the "why" question is not optional. Respectfully, there is no exception to the requirement of a "why" analysis if the "how" analysis aligns with the challenged regulation. Defendants' arguments wither under *Wolford*'s full-scale analysis within the appropriate historical timeframe.

The mere fact that Defendants can point to a few 18th century outlier statutes that prohibited firearms in houses of worship[16] helps their case no more than it helped Hawaii in the defense of its law.

[16] Defendants do not bother with providing historical analogues to its bans in recreation centers, parks, swimming pools, and other places in which Montgomery County banned possession and carrying of firearms. Also unmentioned are any historical analogues to the "buffer zones."

Similarly, most of the laws cited in *MSI* as supposed historical analogues for Bill 23-26E's ban on firearms in the buffer zone,[17] places of worship, parks, libraries, recreational facilities, and multipurpose exhibition facilities are from after 1885, which is too late in time to have significant probative value. *See Wolford*, *supra*, 146 S. Ct. at 2053; *see also Hardaway v. Nigrelli*, 639 F. Supp. 3d 422, 442 (W.D.N.Y. 2022) ("handful" of "outlier" laws "passed nearly a century after the Second Amendment's ratification" did not establish tradition of banning firearms in places of worship). Laws enacted after ratification—especially long after ratification—'"do not provide as much insight into the original meaning as earlier sources.'" *Bruen*, 597 U.S. at 36 (quoting *Heller*, 554 U.S. at 614).

And most of the earlier laws cited in *MSI* were enacted by former slave states shortly after the Civil War. Even assuming those laws were enacted early enough to be proper historical analogues (they were not), the lack of evidence that the reason for those laws is similar to the law at issue here forecloses a holding that they are "relevantly similar." *See Wolford*, 146 S. Ct. at 2056-588 (Barrett, J., concurring) ("[S]everal 18th-century laws that, broadly speaking, prohibited the carry of firearms onto certain property without the owner's consent" "get Hawaii nowhere" because "Hawaii offers no evidence that these laws were designed to" address the reason Hawaii enacted the law."). Defendants cannot justify the Bill on statutes designed to disarm freedmen.

Indeed, enforcement of Bill 23-26E is far more onerous than the Hawaii ban at issue in *Wolford.* At least that ban allowed a property owner to expressly authorize firearms. Here, the County's ban bars property owners from authorizing citizens to carry firearms on their own property. Bill 23-26E is exactly the type of scheme that prohibits citizens from carrying arms into

[17] *See* page six of Plaintiff's Memorandum in Support of its Motion for Preliminary Injunction for a description of the enormous geographic scope of the buffer zones.

locations "people routinely visit in the course of their daily routines . . . [and] hobbles what the Second Amendment protects: the right of Americans to carry arms for self-defense as they go about their lives." *Wolford*, 146 S. Ct. at 2041.

The historical principle the Supreme Court focused on in *Wolford* is this: The people have a right to bear arms in places they routinely visit in the course of their daily routines. *See id*. *Kipke*'s holding is inconsistent with that principle and has been abrogated and is no longer good law. "[I]f the Supreme Court has issued a superseding contrary decision" to a court of appeals decision, this Court is bound to apply the Supreme Court decision and not the circuit court decision. *United States v. Dodge*, 963 F.3d 379, 383 (4th Cir. 2020) (internal quotation marks omitted). Defendants' defense rests largely on a decision in direct conflict with the *Wolford* historical principle and for that reason the defense fails.

*Wolford* concerned a restriction on carry at all private property open to the public. Defendants prohibit the right to publicly carry by banning carry in places typically frequented by the public *and 100 yards beyond those places*. In this regard, Defendants' prohibition is more insidious than Hawaii's. At least in Hawaii, a person might have had some notice of when he was subject to the law's prohibitions. Here, Defendants restrict specific property, *and* they create a spider web seeking to catch unaware gun owners walking along the sidewalk or other nearby public places frequented throughout the peoples' daily lives. Defendants' prohibitions are not always apparent. Whether a person is within 100 yards of a location subject to the ban may not be clear especially if intervening structures, vegetation, or other objects obscure a person's line of sight.

Defendants' attempted analogues from the late nineteenth century cannot overcome the overwhelming contrary laws from the Founding Era. For example, the opening clause of a 1770 Georgia statute stated that "it is necessary for the security and defence [sic] of this province from

internal dangers and insurrections, that all persons resorting to places of public worship *shall be obliged to carry fire arms*." 19 *The Colonial Records of the State Of Georgia*, Part 1, at 137–40 (Allen D. Candler ed., 1904) (emphasis added).[18] Far from requiring the men to seek the permission of church officials to carry firearms, the statute fined those officials five pounds if they failed in their duty to ensure the men in their church were armed.

Similarly, a 1619 Virginia law required all attending church to bear arms, including swords, powder, and shot. Proceedings of the Virginia Assembly, 1619, in Lyon Gardiner Tyler, *Narratives of Early Virginia, 1606-25*, at 273 (1907) (enacted 1619).[19] Maryland's *own* law of 1642 prohibited every man able to bear arms from going to church without a gun and at least one charge of powder and shot. 3 Archives of Maryland at 103 (1642).[20] A 1643 Connecticut law required each family to bring arms to church every Sabbath and lecture day. 1 *The Public Records of the Colony of Connecticut* 95–96 (J. Hammond Trumbull ed. 1850) (enacted 1643).[21] A 1656 Massachusetts law required the militia of every township to bring arms during Sunday church services. Violators were fined twelve pence for every violation. *The Compact with the Charter and Laws of the Colony of New Plymouth* 102 (William Brigham ed., 1836) (enacted 1656) (Apr. 1 through Nov. 30).[22]

The United States' analogues demonstrate the historic principle from the Founding Era, whereas, Defendants' nineteenth-century analogues do not represent any relevant historical

---

[18] Available at https://perma.cc/N5MF-2SRE.

[19] Available at https://tinyurl.com/vanh9cmn.

[20] Available at https://perma.cc/9VC4-5VSN.

[21] Available at https://perma.cc/Z8G7-9QJJ.

[22] Available at https://perma.cc/C6VD-YFXL.

tradition.[23] When laws from the two different eras conflict, the Founding Era squarely controls. *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N. J.*, 183 F.4th 211, 232 (3d Cir. 2026).

Not only are Defendants' cited laws not actually analogous, they are also too sparse to establish an historical tradition. Defendants cite only four states, two cities, and two territories[24] from approximately 1870 to 1890 for their alleged analogues. There were 37 states in 1870 and 42 in 1890. Accordingly, Defendants cannot meet their *Bruen* step-two burden.

## II. Failure to Enjoin Defendants Will Result in Irreparable Harm.

Defendants' constitutional deprivation is present. Defendants make the curious claim that the "only irreparable harm that the United States proffers is an alleged deprivation of a constitutional right." Def. Memo. 27. However, ". . . a deprivation of a constitutional right, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) *(quoting Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

In this Circuit, it is presumed "that a legislature enacts a statute with the intent that it be enforced." *Bryant v. Woodall,* 1 F.4th 280, 286 (4th Cir. 2021) (citations omitted). Here, the presumption that law enforcement is enforcing Bill 23-26E finds support in the County Executive's public statements and the Sheriff's refusal to agree not to enforce. When given the opportunity to

---

[23] Defendants' citations to several 18th-century judicial decisions are likewise in vain, because they too have been abrogated by the Supreme Court's recent decisions interpreting the Second Amendment. For example, *Hill v. State*, 53 Ga. 472 (1874), cited by the Defendants, conceived of the right to bear arms as connected to the service in organized militia—a view squarely foreclosed by *Heller*. *English v. State*, 35 Tex. 473 (1872) was also rejected by the Court in *Bruen* because it concluded that this decision was an outlier. *Bruen*, 597 U.S. at 64-65. And *Andrews v. State*, 50 Tenn. 165 (1871), is of little instructive value because the statement in that case approving limits on "carrying arms to church," is dicta with no citation to any authority whatsoever.

[24] The Supreme Court explicitly rejected reliance on laws adopted in the Territories of, *inter alia*, Arizona and Oklahoma as evidence of the Second Amendment's scope. *See Bruen*, 597 U.S. at 67-68 ("[W]e will not stake our interpretation on a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also contradict the overwhelming weight of other, more contemporaneous historical evidence.") (internal quotations omitted). In light of this caution from the Court, Defendants' citation to Arizona's and Oklahoma's territorial laws, Def. Memo. 23, is unhelpful.

rebut that presumption by disclaiming enforcement while Plaintiff sought preliminary relief, Defendants refused to do so. Defendants cleave to their law enforcement misconduct.

Defendants claim that being allowed to "carry a handgun in 74% of the County[]" "is hardly an impact" that is "so extensive" as to require this Court's intervention. Def. Memo. at 26. That statement demonstrates the Defendants' crabbed and erroneous view of the Second Amendment. In any event, "[a] government that takes three limbs but spares the last imposes an injury all the same." *First Choice Women's Res. Centers, Inc. v. Davenport*, 608 U.S. 174, 197 (2026). Like many governments, Defendants view the right protected by the Second Amendment as a second-class right. One cannot imagine that Defendants would say the same thing about any other fundamental right. Would Defendants say that it is perfectly fine if citizens can practice First Amendment rights only 74% of the time? One doubts it. The Constitution is not a cafeteria plan where these Defendants are allowed to pick and choose what parts they like. The "Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Bruen*, 597 U.S. at 26. (citation omitted).

**III. The Balance of Equities and the Public Interest Favor Injunctive Relief.**

Both the balance of equities and public interest factors support an injunction. Defendants argue that they would "suffer a form of irreparable injury" if enjoined. Def. Memo. at 28. But enjoining an unconstitutional ordinance causes no harm because Defendants are "in no way harmed by issuance of a preliminary injunction which prevents [them] from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (citation omitted).

The lawful exercise of Second Amendment rights does not encumber Defendants asserted interest in preventing crime. Def. Memo. at 28. Defendants can still enforce laws against illegal

gun activity. However, Defendants should not be permitted to violate individuals' Second Amendment rights any more than it can be served by violating their Fourth, Fifth, Sixth, or Eighth Amendment rights in the name of law enforcement. *See, e.g.*, *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person."). As the Supreme Court explained, "[t]he constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 597 U.S. at 70 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)). The Court should enjoin Defendants from treating it that way.

And as to public interest, not only does "the public undoubtedly has an interest in seeing its governmental institutions follow the law," *Roe v. Dep't of Def.*, 947 F.3d 207, 230-31 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (internal quotes omitted), but the public benefits from being able to use firearms for lawful purposes such as self-defense.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests the Court to deny Defendants' motion to dismiss and grant Plaintiff's motion for preliminary injunction. If this Court grants Defendants' motion in any part, Plaintiff seeks leave to amend its Amended Complaint.

DATED: September 10, 2026

Respectfully submitted:

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

R. JONAS GEISSLER
Deputy Assistant Attorney General

BARRY K. ARRINGTON
Chief, Second Amendment Section

*/s/ Gregory Dolin*
GREGORY DOLIN
Senior Counsel

WILLIAM J. HANRAHAN
PATRICK TODD
KEITH GAINES
Trial Attorneys
Second Amendment Section
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
Telephone:(202) 304-8447
E-Mail: gregory.dolin@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA